**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roger Leroy HINES, Defendant–Appellant.**

Nos. 92–30441, 92–30443.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 3, 1994.

Decided June 20, 1994.

---

1. The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

Kathleen M. Correll, Asst. Federal Public Defender, Portland, OR, for defendant-appellant.

John F. Deits, Asst. U.S. Atty., Portland, OR, for plaintiff-appellee.

Before: POOLE and TROTT, Circuit Judges, and KING,* District Judge.

Opinion by Judge TROTT.

TROTT, Circuit Judge:

Roger Hines appeals the sentence imposed by the district court following his guilty pleas to making threats against the President, in violation of 18 U.S.C. § 871, and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He argues the district court erred in applying the Sentencing Guidelines by: (1) imposing a six-level enhancement for "conduct evidencing an intent to carry out" the threat; (2) failing to group both counts; (3) departing upward six levels because the President of the United States was the official victim; and (4) departing upward three levels based on Hines's

---

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

"extremely dangerous mental state" and underrepresented criminal history. We have jurisdiction pursuant to 18 U.S.C. § 3742. Although we reject most of Hines's arguments, we remand to the district court with instructions to explain the extent of its departure based on Hines's dangerous mental state and underrepresented criminal history.

## I

On January 13, 1992, Roger Hines stole a .357 magnum revolver and 50 rounds of ammunition in Oregon. He then travelled to Washington, D.C. in order to kill President George Bush and become famous. Armed with the gun, Hines went to a school where he believed the President would be making an appearance. Fortunately, the President was 45 miles away.

Hines left Washington, D.C. at the end of January 1992 and travelled west. On February 12, 1992, Hines sold the .357 magnum at a gunshop in San Francisco. Four days later, while in Salt Lake City, Hines mailed a letter to his state probation officer in Oregon. The letter stated:

> I haven't kill, but I could and will if I need to. I am on my way back east again. . . . [T]he first time I went back was to kill President Bush and was so close to doing so. I was at Fort Mead and he was at a kid's daycare center preschool. I was within 30 feet of him and I had that .357 in my hand in the pocket. I wanted to be known as someone in this U.S.A.
>
> . . . .
>
> But now I need to be stopped. I will kill someone a boy, yes for sex. Maybe. I need help 1) by going to jail 2) kill myself 3) being kill by police, I want to die and you need to do so right now I am going after President Bush to do the job the right way.

Presentence Report at 2–3. Hines also stated in his letter that he had a .44 magnum, and he included a picture of a 14–year–old boy he claimed he molested.

The letter triggered a nationwide manhunt for Hines by the United States Secret Service. Their suspect was a 6'4", 457–pound, 35–year–old man. Hines had four prior criminal convictions and five hospitalizations for mental problems. Agents contacted Hines's psychiatrist who explained that Hines once brought an ax into the hospital, threatening patients and staff. Although the hospital staff eventually subdued Hines, the psychiatrist stated that Hines was dangerous when off his medication and should be taken into custody immediately. Agents also contacted Hines's known friends and relatives, several of whom had received postcards from Hines. One postcard depicted a Derringer gun and a newspaper article about the assassination of Abraham Lincoln.

On February 24, 1992, Hines left a message for a postal inspector in Portland, Oregon for whom Hines was once a confidential informant. The message read, "Tell him that I am watching his children and that I am a child molester and for him to watch out and this is Roger Hines." *Id.* at 3.

On February 28, 1992, Hines was arrested at a bus depot in Portland, Oregon. He had a butcher knife, a hunting knife, and a handwritten diary. In a written statement, Hines told agents that he would "kill President Bush some other time." He also admitted sending postcards and letters which stated he wanted to kill President Bush.

Hines's diary provides a frightening look into this disturbed man. It contains explicit descriptions about sodomizing young children and killing one boy. Typical of the comments is the following: "In the last 24 years I have had sex with about 20 kids from the ages 6 mos to 17 years old." *Id.* at 39. Agents, however, found no independent evidence corroborating these claims. The diary also contained many references to Hines's desire to kill President Bush.

While in custody, Hines wrote a letter to a local television station stating that he did threaten President Bush and would do it again in a "hart beat" if he could get out of jail. He explained he wanted to kill President Bush to get attention. If he could not kill President Bush, Hines said he wanted to be like Westley Allan Dodd.[1] Hines also

---

1. Westley Allan Dodd was a notorious child molester and murderer in the Pacific Northwest. In

sent another letter while in custody to a woman acquaintance. He told the woman:

Because I was on a killing roll and you could have ben next. I was going to rob you and cut you up into parts and kept your head for a layer.... [Y]ou should hope I dont get out of jail for about ten years, because you could be next.

*Id.* at 45.

On June 1, 1992, Hines pled guilty to making threats against the president and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 871 and 922(g)(1). At the sentencing hearing, the district court adopted the Presentence Report and calculated defendant's combined offense level to be 18, which included a six-level enhancement under the Sentencing Guidelines because Hines engaged in conduct evidencing an intent to carry out the threat. *See* U.S. Sentencing Comm'n, *Guidelines Manual* § 2A6.1(b)(1) (Nov. 1991) (hereinafter "U.S.S.G."). The district court imposed a six-level upward departure, instead of the Presentence Report's recommendation of a three-level upward departure, because the President was the "official victim" of the threat. *See* U.S.S.G. § 3A1.2, comment. (n. 2). The court also departed upward three levels for a "convergence of factors," specifically Hines's "extraordinarily dangerous mental state" and "significant likelihood that he will commit additional serious crimes." Hines's final offense level was 27, and his criminal history category was IV. The applicable sentencing range was 100 to 125 months. The court sentenced Hines to 100 months imprisonment for being a felon in possession of a firearm and a concurrent 60 months for making threats against the President, followed by three years of supervised release.

## II

■ The Sentencing Guidelines require a six-level enhancement to the crime of threats against the President if the defendant "engaged in any conduct evidencing an intent to carry out such threat." U.S.S.G.

§ 2A6.1(b)(1). Hines argues the enhancement was inapplicable because the court could not consider conduct occurring prior to February 16, 1992—the date he sent the threatening letter. The district court rejected this argument.

I accept the presentence report as written. I further find that there is a nexus between the fact that the defendant did in fact go to Washington, D.C. with a weapon with the intent to kill the President, with the subsequent letter of threat in the fact that that demonstrated that he had taken an overt act to do this act, and then followed up to say that he's going—the next time, he's going to do it essentially and do it right and accomplish the mission. *So I do think that that prior conduct is relevant in respect to that threat.*

Rep.Tr. 10/9/92 at 42 (emphasis added).

■ The district court's finding that Hines's conduct evidenced an intent to carry out his threat is a factual finding that we review for clear error. *United States v. Sauerwein,* 5 F.3d 275, 278 (7th Cir.1993); *see United States v. Chapnick,* 963 F.2d 224, 226 (9th Cir.1992). The issue of whether conduct preceding the threat may be the basis for imposing the enhancement is an application of the Sentencing Guidelines that we review de novo. *See United States v. Fagan,* 996 F.2d 1009, 1017 (9th Cir.1993). We reject Hines's argument and hold that conduct preceding a threat may be the basis for applying the six-level enhancement of U.S.S.G. § 2A6.1(b)(1).

Hines relies on the Second Circuit's decision in *United States v. Hornick,* 942 F.2d 105, 108 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 942, 117 L.Ed.2d 112 (1992), holding that under U.S.S.G. § 2A6.1(b)(1) "conduct needed to show an intent to carry out a threat must occur either contemporaneously with or after the threat." The court explained its holding as follows:

A person cannot take action that will constitute proof of his intent to carry out a threat until after the threat has been

1990, Dodd pled guilty to the brutal rape and murder of three young boys. Dodd kept a diary filled with graphic descriptions of his crimes and fantasies. *See State v. Dodd,* 120 Wash.2d 1, 838 P.2d 86 (1992). In 1993, the State of Washington executed Dodd.

made. The Background Commentary to § 2A6.1 states the seriousness of conduct constituting threatening communications depends on the defendant's intent and likelihood that he would carry it out. The tense is future conditional, suggesting the guidelines contemplate a future, not a past, event. In addition, the use of the words "to carry out" makes clear that the threat must first exist before it may be carried out.

*Id.* In light of *Hornick,* Hines argues the district court should not have considered his theft of the .357 magnum and his journey to Washington, D.C. because those actions occurred prior to the date he mailed the threatening letter.[2]

We, however, decline to follow *Hornick.* Instead of focusing on the purpose of the enhancement, the *Hornick* court unduly emphasized the commentary's use of the future conditional. The commentary to U.S.S.G. § 2A6.1 states: "These statutes cover a wide range of conduct, the seriousness of which depends upon the defendant's intent and the likelihood that the defendant would carry out the threat. The specific offense characteristics are intended to distinguish such cases." U.S.S.G. § 2A6.1, comment. (backg'd). The purpose of the enhancement is clear: Defendants who act on their threats are more dangerous, and therefore, deserve more punishment. The critical issue should not be the timing of the conduct, but whether the conduct shows the defendant's intent and likelihood to carry out the threats. As one court noted,

> It would ... make little sense to hold one defendant who sends a threatening letter to a public official less culpable than another defendant convicted of a similar offense, where the first individual had several months earlier actually attempted to shoot the official, whereas the second had only

bought a gun on the day he wrote his letter.

*United States v. Harris,* 763 F.Supp. 546, 551 n. 11 (M.D.Ala.1991); *see also United States v. Fonner,* 920 F.2d 1330, 1332–33 (7th Cir. 1990) (stating in dicta that defendant's killing of a police officer fifteen years before sending a threatening letter to the dead police officer's partner may be considered conduct evidencing an intent to carry out the threat); *cf. United States v. Houser,* 929 F.2d 1369, 1373 (9th Cir.1990) (evidence of prior crimes and bad acts may be admitted under Fed. R.Evid. 404(b) to show intent).

Hines's theft of a .357 magnum and trip to Washington, D.C. to kill President Bush are too relevant to ignore. Hines was not just making idle threats; he acted on them. We believe U.S.S.G. § 2A6.1 does not require the courts to wear blinders, ignoring all acts occurring before a threatening communication is made.

■ Additionally, even if the district court could not consider acts prior to February 16, Hines's subsequent actions were sufficient to justify the enhancement. After his arrest, Hines stated he would "kill President Bush some other time." He sent postcards and letters to friends and relatives stating he wanted to kill President Bush. He was armed with two large knives when arrested, and he threatened to kill a woman and molest a postal inspector's children.

Therefore, the district court did not err in applying the six-level enhancement of U.S.S.G. § 2A6.1(b)(1).

### III

■ Hines also claims the district court should have grouped his two convictions as "closely related" counts. We review de novo the district court's decision regarding the grouping of offenses because this decision

---

**2.** Hines also cites *United States v. Philibert,* 947 F.2d 1467 (11th Cir.1991), for the proposition that conduct occurring prior to the threat may not be considered under U.S.S.G. § 2A6.1(b)(1). The Eleventh Circuit did reverse the district court's application of the enhancement. However, the court held the enhancement was inapplicable because "there was no evidence to suggest any connection whatever between appellant's ac-

quisition of firearms in June and any effort to carry out the threat made against [appellant's supervisor] on August 11th.... [T]here is no evidence whatever that he had any intention of carrying out the threat." *Id.* at 1471. Thus, the *Philibert* court only held that there was no connection between the prior acts and the threat. It did not hold, like *Hornick,* that prior acts could not be considered.

involves an application of the Guidelines, *see Fagan*, 996 F.2d at 1017, but we reject Hines's claim.

Closely-related counts are those "involving substantially the same harm." U.S.S.G. § 3D1.2. Under U.S.S.G. § 3D1.2(c), counts should be grouped together "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." According to Hines, the district court relied on the possession of the .357 firearm (the basis for his felon in possession of a firearm violation) to apply the specific offense characteristic of conduct evidencing an intent to carry out the threat under U.S.S.G. § 2A6.1(b)(1). Therefore, Hines argues, the gun possession was "double counted."

The government argues that the district court need not and did not rely on Hines's mere possession of the .357 magnum to apply U.S.S.G. § 2A6.1(b)(1). The Presentence Report, adopted by the district court, stated that Hines's "possession of the .357 magnum firearm was not considered in the six-level enhancement" under U.S.S.G. § 2A6.1(b)(1). The Presentence Report listed four other factors as the basis for the enhancement, including: the trip to Washington, D.C., the possession of large knives, the discussion of possessing a .44 magnum pistol, and the mailing of additional correspondence.

But based on our de novo review of the record, it is clear that Hines's possession of the .357 firearm was powerful evidence of his intent to carry out his threats. Despite the statement in the Presentence Report, we believe the district court *did* rely on Hines's possession of the weapon to apply U.S.S.G. § 2A6.1(b)(1). In its findings, the court stated: "I find that there is a nexus between the fact that the defendant did ... go to Washington, D.C. *with a weapon* with the intent to kill the President, with the subsequent letter of threat...." (emphasis added). Moreover, we question whether a district court could avoid grouping closely-related counts by "ignoring" relevant conduct.

Nonetheless, we do not believe U.S.S.G. § 3D1.2(c) requires that the two counts—threats against the President and felon in possession of a firearm—be grouped together. "One of the purposes of § 3D1.2(c) is to combine like offenses so as to prevent multiple punishment for substantially identical offense conduct." *United States v. Barron–Rivera*, 922 F.2d 549, 554 (9th Cir.1991) (internal quotation omitted). For example, suppose a defendant is convicted of bank robbery with a firearm and unlawful possession of that firearm. The guideline for robbery has a five-level enhancement for the specific offense characteristic of possessing a firearm during a robbery. *See* U.S.S.G. § 2B3.1(b)(2)(C). Accordingly, the two counts are grouped pursuant to U.S.S.G. § 3D1.2(c) because the conduct embodied in the unlawful possession of the firearm count is substantially identical to the specific offense characteristic of possession of a firearm during a robbery. *See* U.S.S.G. § 3D1.2, comment. (n. 5).

By contrast, the conduct embodied in being a felon in possession of a firearm is not substantially identical to the specific offense characteristic of engaging in conduct evidencing an intent to carry out a threat against the President. Conduct evidencing an intent to carry out a threat may be manifested in many different ways. In fact, the Presentence Report listed several ways in which Hines evidenced his intent to carry out the threat besides the possession of the firearm.

Grouping the two counts also creates an anomalous result. Because Hines could have received the U.S.S.G. § 2A6.1(b)(1) enhancement without possessing the firearm—precisely what the Presentence Report suggested, Hines would receive the same sentence whether or not he possessed the firearm. *Cf. United States v. Lombardi*, 5 F.3d 568, 571 (1st Cir.1993) (rejecting argument that U.S.S.G. § 3D1.2(c) requires same offense level for one who commits mail fraud and launders the money with someone who just launders the money knowing of its source). This result conflicts with principle that "offenses should not be grouped if they pose threats to distinct and separate societal interests." *Barron–Rivera*, 922 F.2d at 555. Because the count of felon in possession of a firearm and the specific offense characteristic of conduct evidencing an intent to carry out a

threat are not "substantially identical", we hold that the district court did not err in refusing to group Hines's two convictions pursuant to U.S.S.G. § 3D1.2(c).

## IV

■■■ Hines challenges the district court's decision to depart upward six levels because the President was the official victim of the threats. We review departures from the Sentencing Guidelines under the three-part test established in *United States v. Lira–Barraza*, 941 F.2d 745, 746–47 (9th Cir.1991) (en banc). First, we must determine whether the trial court had legal authority to depart. A district court may depart upward from the applicable guideline range only if the court identifies an aggravating circumstance "of a kind or to a degree the [Sentencing] Commission did not adequately take into account when formulating the Guidelines." *Id.* at 746. Second, we review for clear error the factual findings identified by the district court in support of the aggravating circumstance. *Id.* Finally, we review the reasonableness of the extent of the district court's departure "in light of the standards and policies incorporated in the Act and the Guidelines." *Id.* at 751. The district court must explain the reasoning for both the direction and the degree of its departure in sufficiently specific language to allow meaningful review. *Id.*

■■■ Under the *Lira–Barraza* test, the district court had legal authority to depart because the President was the official victim. Under the Guidelines, a court may apply a three-level enhancement if the victim is a law-enforcement or corrections officer. *See* U.S.S.G. § 3A1.2(a). The commentary states: "Certain high-level officials, *e.g.*, the President and Vice–President, are not expressly covered by this section. The court

should make an upward departure of *at least three levels* in those unusual cases in which such persons are victims." *Id.* § 3A1.2, comment. (n. 2) (emphasis added). Additionally, the district court's finding that the President was the official victim is not clearly erroneous. *See United States v. McCaleb*, 908 F.2d 176, 178–79 (7th Cir.1990) (President was "official victim" of threat to kill which was mailed to Secret Service, even though President was not personally aware of threat).

Consequently, Hines's only possible claim is that the departure was unreasonable. However, the district court carefully explained the extent of the departure. The court stated: "Comparing the domestic and international consequences of the assassination of the President to that of a law enforcement officer, not discounting the personal loss involved, leads the court to the conclusion that an upward departure of six levels is appropriate." 10/15/92 Amended Findings of Fact Order at 3. Because the Guidelines suggested a departure of "at least three levels," the district court's six-level departure was not unreasonable, especially in light of the court's detailed explanation.[3]

## V

Finally, Hines challenges the district court's three-level upward departure based on a "convergence of factors." The court found that Hines's "extremely dangerous mental state was not adequately considered by the guidelines." 10/15/92 Amended Findings of Fact Order at 3. The court acknowledged that "mental and emotional conditions are not ordinarily relevant in determining a sentence outside the guidelines." *Id.*[4] However, the district court believed Hines's "extraordinarily dangerous mental state, as evidenced by his homicidal and sexual fantasies which are documented in his numerous let-

---

**3.** The 1992 version of the Guidelines further supports the reasonableness of the district court's six-level departure. Under the 1992 Guidelines, a three-level enhancement now applies if the victim was a "government officer or employee." U.S.S.G. § 3A1.2(a) (Nov. 1992). However, "[c]ertain high-level officials, *e.g.*, the President and Vice President, although covered by this section, do not represent the heartland of the conduct covered. An upward departure to reflect the potential disruption of the governmental

function in such cases typically would be warranted." *Id.* § 3A1.2, comment (n. 2).

**4.** "Mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)." U.S.S.G. § 5H1.3.

ters and his diary, as well as psychiatric records, support a departure pursuant to U.S.S.G. § 5K2.0." *Id.* According to the court, this finding "converges with the issue of whether the defendant's criminal history category does not adequately reflect the dangerousness and the significant likelihood that he will commit additional serious crimes" under U.S.S.G. § 4A1.3. *Id.* at 4. Based on both U.S.S.G. §§ 5K2.0 and 4A1.3, the district court departed upward three levels.

■ Applying the *Lira–Barraza* test for upward departures, we must first determine whether the trial court had legal authority to depart. Under U.S.S.G. § 5K2.0, the district court may depart "if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.' " (quoting 18 U.S.C. § 3553(b)). Under U.S.S.G. § 4A1.3, the district court may depart if "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."

Hines argues the district court did not have authority to depart, relying on *United States v. Doering,* 909 F.2d 392 (9th Cir. 1990). In *Doering,* the Ninth Circuit reversed a district court's upward departure. Although the parties disputed the basis for the departure, the *Doering* court found the "district court did depart, at least in part, based upon Doering's need for psychiatric treatment." *Id.* at 394. The *Doering* court held that "a defendant's mental and emotional condition is only relevant to a sentencing determination (1) in the extraordinary case and (2) as provided in Chapter Five of the Guidelines." *Id.*

■ The question decided in *Doering* was "whether *the need* for psychiatric help constitutes the type of extraordinary instance where a defendant's mental and emotional condition is relevant to the sentencing determination. The answer to this question is plainly no." *Id.* at 395 (emphasis in original). To support its conclusion, the *Doering* court cited 28 U.S.C. § 994(k), which requires the Sentencing Commission to "insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed ... medical care." A district court's departure may not be upheld simply because the court may have relied on factors other than the need for psychiatric treatment. As the *Doering* court observed, " '[W]hen some of the reasons stated are proper and some are improper, we must vacate and remand for resentencing.' " 909 F.2d at 395 (quoting *United States v. Cervantes Lucatero,* 889 F.2d 916, 919 (9th Cir.1989)).

In this case, the district court did not depart based on Hines's need for psychiatric treatment. Hines tries to buttress his claim by citing statements made by the district court at the sentencing hearing.[5] However, those statements should be viewed as attempts to explain the sentence to a person suffering serious mental problems. We look to the district court's Findings of Fact Order (Statement of Reasons) for an explanation of the departure.

In its written order, the district court did not mention the need for psychiatric treatment. Rather, the court stressed that Hines posed "an *extraordinary danger* to the community because of his serious emotional and psychiatric disorders." (emphasis added). The district court's explanation satisfies the test outlined in *Doering* because (1) this was

---

5. At the sentencing hearing the court said:
   This is a situation where you need help, you're crying out for help, and its a question whether we're going to be sending you to prison to a psychiatric—for psychiatric hospitalization in a prison setting like at Rochester who will treat you more like a patient than a prisoner. . . .
   . . . .
   I find beyond any reasonable doubt that you do suffer from a very serious psychiatric disorder that possesses a high risk for not only yourself, but other members of the public until you've undergone extensive and prolonged psychiatric treatment, that you will be a danger to yourself and to others.
   . . . .
   Mr. Hines, the purpose behind all this is, as your own psychologist said this morning, is to protect—that you need long range care.
   Rep.Tr. 10/9/92 at 41, 45, 48.

an extraordinary case and (2) the court relied on U.S.S.G. § 5K2.0. *See Doering*, 909 F.2d at 394; *see also* U.S.S.G. § 5H1.3. Therefore, the district court had authority to depart pursuant to U.S.S.G. § 5K2.0.[6]

■ The district court also based its upward departure on U.S.S.G. § 4A1.3. The court found that Hines's "criminal history category does not reflect that dangerousness and the significant likelihood that he will commit additional serious crimes." Because the Sentencing Guidelines explicitly provide for departure on those grounds, the district court had legal authority to depart based on U.S.S.G. § 4A1.3.

## B

■ The second prong of the *Lira–Barraza* test requires us to review for clear error the district court's factual findings supporting departure. The district court's finding that Hines was extraordinarily dangerous because of his mental and emotional disorders is not clearly erroneous. Hines's criminal history and hospitalizations support the court's findings. The threats and descriptions contained in Hines's letters and diary portray a man who is obviously mentally disturbed. While Hines points to the testimony of a psychologist who stated he believed Hines was not a "serious risk," this testimony, by itself, does not make the court's factual finding clearly erroneous.

Similarly, the district court's finding regarding Hines's "claims of past sexual offenses, continuing fantasies of sexual offenses and continuing threats against adults and children" are not clearly erroneous.

## C

■ Under the final prong of the *Lira–Barraza* test, we must determine whether the departure is reasonable. "A district court must 'give adequate reasons for departure and for the extent of departure.'" *United States v. Reyes*, 8 F.3d 1379, 1388 (9th Cir.1993) (quoting *United States v. Faulkner*, 934 F.2d 190, 191 (9th Cir.1991)). The district court "should include a reasoned explanation of the extent of the departure founded on the structure, standards and policies of the Act and Guidelines." *Lira–Barraza*, 941 F.2d at 751.

In the present case, the district court did not explain why it chose to depart three levels, rather than two or five levels. The district court articulated its reasons for departure, but it did not articulate the reasons for the extent of the departure. A specific explanation is necessary to facilitate meaningful appellate review. *See id* at 749–50. Therefore, we must remand to allow the district court to explain the extent of its departure.[7]

---

6. Hines also argues the departure is prohibited by U.S.S.G. § 5K2.13, which provides a diminished capacity defense for nonviolent offenses. While this section clearly does not apply to Hines, he argues that because the Commission already considered whether a mental condition can result in a departure for diminished capacity, courts cannot consider mental conditions for other types of departures. This argument has no merit.

U.S.S.G. § 5H1.3 specifies that mental condition should not be considered "except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)." *Both* U.S.S.G. §§ 5K2.0 and 5K2.13 satisfy that requirement. Dicta in *Doering* states that the "only potential relevant exception under Chapter Five is section 5K2.13's diminished capacity exception." 909 F.2d at 394. However, after finding U.S.S.G. § 5K2.13 irrelevant, the *Doering* court continued to analyze "whether *the need* for psychiatric help constitutes the type of extraordinary instance

where a defendant's mental and emotional condition is relevant." *Id.* at 395. Thus, the inapplicability of U.S.S.G. § 5K2.13 was not dispositive.

7. We note that the district court justified the three-level departure under both U.S.S.G. §§ 5K2.0 and 4A1.3. Normally, when § 4A1.3 is applicable, the court should "use, as a reference, the guideline range for a defendant with a higher or lower criminal history category." U.S.S.G. § 4A1.3. In other words, the district court should adjust the criminal history category, not the offense level. *But see United States v. Cook*, 972 F.2d 218, 221–22 (8th Cir.1992) (affirming two-level upward departure under U.S.S.G. § 4A1.3 where defendant threatened to kill federal agent when released from prison), *cert. denied*, ─── U.S. ───, 113 S.Ct. 991, 122 L.Ed.2d 142 (1993). However, because the district court based its departure on both U.S.S.G. §§ 5K2.0 and 4A1.3, we hold that the district court did not err in adjusting the offense level, instead of the criminal history category.

VI

We hold that the district court did not err in (1) imposing the six-level enhancement of U.S.S.G. § 2A6.1(b)(1) for "conduct evidencing an intent to carry out" a threat; (2) deciding not to group Hines's offenses pursuant to U.S.S.G. § 3D1.2(c); and (3) departing upward six levels because the President was the official victim. Regarding the three-level upward departure for a "convergence of factors," we hold that the district court may depart upward based on a defendant's extraordinary mental and emotional condition pursuant to U.S.S.G. § 5K2.0. We further hold that the district court's determination that the defendant was extraordinarily dangerous is not clearly erroneous. However, we remand to the district court with instructions to explain the reasons for the extent of the three-level departure in light of this opinion.

REMANDED.