UNITED STATES of America

v.

Francisco Martin DURAN, Defendant.

Crim. No. 94–447 (CRR).

United States District Court,
District of Columbia.

June 29, 1995.

Eric A. Dubelier and Brenda J. Johnson, Asst. U.S. Attys., Washington, DC, along with Eric H. Holder, Jr., U.S. Atty. for the District of Columbia, for the U.S.

A.J. Kramer, Federal Public Defender, Washington, DC, and Leigh A. Kenny, Asst. Federal Public Defender, Washington, DC, for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

On June 29, 1995, the Defendant, Francisco Martin Duran, was sentenced by this Court to 480 months in prison, followed by a five-year term of supervised release, for his April 4, 1995 conviction by jury on Counts One through Ten of the Superseding Indictment filed in this case on March 16, 1995. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law with respect to the sentence imposed on each count, the term of supervised release, the special assessment, and the restitution.

### BACKGROUND

The Defendant, Francisco Martin Duran, is a 26–year–old male who has a high school diploma and thirty credit hours toward his college degree. Francisco Duran is also a man who loves guns and hates the United States government, including its leader, the President. Having travelled cross-country from Colorado and armed with a semiautomatic assault rifle under his trench coat, the Defendant positioned himself in front of the White House on October 29, 1994 and fired twenty-nine rounds in the direction of a tour group on the North lawn, whose members included one Dennis Basso, a man resembling President Clinton. While the Defendant was attempting to reload his rifle with another 30–round clip, a bystander heroically tackled him. Secret Service Officers reached the scene and arrested the Defendant. The testimonial and demonstrative evidence presented at trial plainly revealed that the Defendant's intent was to kill the President of the United States.

On April 4, 1995, a jury convicted the Defendant on all counts of the Superseding Indictment filed March 16, 1995, which charged him with Attempted Murder of the President of the United States, in violation of 18 U.S.C. § 1751(c) (Count One); Forcible Assaults on Officers of the United States, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts Two through Five); Possession of Firearms by a Convicted Felon, in violation of 18 U.S.C. § 922(g) (Counts Six and Sev-

en); Injury and Depredation Against Property of the United States, in violation of 18 U.S.C. § 1361 (Count Eight); Carrying and Using a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c) (Count Nine); and Interstate Transportation of a Firearm, in violation of 18 U.S.C. § 924(b) (Count Ten).

With the exceptions outlined below, the Court adopts as its findings of fact the information set forth by the Probation Officer in the revised Presentence Investigation Report ("PSR"), dated June 22, 1995.

### DISCUSSION

The Defendant's objections to the PSR fall into two categories: items that do not affect the guideline range, and items that do affect the guideline range. The Probation Officer responded to many of the Defendant's objections by amending the PSR accordingly. With respect to those objections which the Probation Officer did not incorporate, however, the Court makes the following findings. The Court also sets forth its reasons for departing nine offense levels upward from the applicable guideline range.

### I. OBJECTIONS THAT DO NOT AFFECT THE GUIDELINE RANGE

1) *The Court Finds that the Probation Officer Appropriately Included in the PSR the "Aliases" Obtained from the National Crime Information Center*

The PSR lists fourteen aliases of the Defendant. PSR at p. 1b. Counsel for the Defendant requests that the PSR state that Mr. Duran provided law enforcement officials with his true name and that he at no time attempted to deceive law enforcement officers or the Court about his identity. Counsel also points out that six of the aliases are short forms of the Defendant's given first name.

The Court agrees with the Probation Officer that the Presentence Investigation Report does not contain any information that suggests, directly or indirectly, that the Defendant attempted to deceive law enforcement officials, and the Court has not considered this information in determining the Defendant's sentence. In deference to the De-

fendant, however, the Court observes that there is no evidence on the record to suggest that the Defendant tried to deceive law enforcement officials about his identity at the time of his arrest or thereafter.

The Court further observes that the information, which the Probation Officer acquired from the National Crime Information Center, could be relevant or important in the future, in the event of further criminal activity or violations of the conditions of the Defendant's supervised release. For that reason, and because there is no prejudice to the Defendant resulting from the inclusion of his aliases, the Court adopts the PSR's findings on this subject.

2) *The PSR Correctly States that the Court Granted a "Motion for an Independent Psychiatric and Psychological Examination of Defendant Duran"*

■ The PSR states that "[o]n January 18, 1995 the Honorable Charles R. Richey granted a motion for an *independent* psychiatric and psychological examination of defendant Duran, pursuant to 18 U.S.C. §§ 4242(a) and 4247(b)." PSR at ¶ 2 (emphasis added). Counsel for the Defendant requests that the word "independent" be replaced by the word "government" as the three doctors who testified as prosecution witnesses were chosen by the prosecution, and not the Court.

The Court finds that the PSR is wholly accurate in that it reflects the title of the Government's Motion granted by the Court. The PSR is also consistent with the relevant statute, which states that "the court, upon motion of the attorney for the Government, shall order that a psychiatric or psychological examination of the defendant be conducted...." 18 U.S.C. § 4242(a). Accordingly, the Court finds no merit to the Defendant's objection.

3) *In Response to the Defendant's Objection to the PSR's Statement that the Four Secret Service Officers "Ran" Through the Field of Fire, the Court Observes that Three of the Secret Service Officers Were Squarely Positioned Within the Field of Fire, and the Fourth Ran to Dodge the Defendant's Fire*

The PSR states that "[f]our officers of the United States Secret Service ran through the defendant's field of fire in an attempt to stop the defendant." PSR at ¶ 18. While correctly noting that the Defendant was convicted of assaulting, impeding, obstructing, or interfering with four Secret Service officers, defense counsel dispute that four officers ran through the field of fire and ask that the above-quoted phrase be changed to state that at least four Secret Service officers were on the White House grounds during the shooting.

Upon careful scrutiny of the record, the Court finds that a more precise articulation of the evidence would be that three Secret Service officers were positioned in the field of fire, while a fourth Secret Service officer ran to avoid the field of fire. *See, e.g.,* Testimony of Carl Anthony Persons, Tr. at 136 (March 22, 1995) (moved off to his right after seeing the gun barrel which was "moving in a sweeping motion back and forth, and moved—it was moving in [his] direction"); Testimony of Henry Tejeda, Tr. at 78–83 (March 23, 1995) (on the north portico when the shooting started and then ran toward the Defendant); Testimony of Gary Sean Coffey, Tr. at 144 (March 23, 1995) ("noticed the barrel of a weapon protruding through the fence aimed in [his] direction;" the weapon was firing); Testimony of Harry O. Wilson, Tr. at 134–35 (Mar. 23, 1995) ("I was basically running out of [the Defendant's] way because he was shooting as he was running down the fence line in my direction."). While the PSR's statement is not flatly incorrect, the Court finds that a more accurate representation of the evidence is that, while three Secret Service officers were located in the field of fire, a fourth had to run to avoid the field of fire.

4) *The Jury Precisely Found the Defendant Had Not Proved, By Clear and Convincing Evidence, that He Was Insane at the Time of the Offense*

The PSR states that "the jury found that the defendant was not mentally ill at the time of the offense and found him guilty of the 10–count re-typed Superseding Indictment." PSR at ¶ 96. In so doing, the PSR appears

to refer to an earlier statement that "the jury rejected his defense of not guilty by reason of insanity." PSR at ¶ 89. Counsel for the Defendant asks that the sentence in paragraph 96 be modified to indicate that the jury found that the Defendant had not proved by clear and convincing evidence that he was insane at the time of the offenses. Counsel did not object to the statement in paragraph 89.

Although paragraph 96 of the PSR is not incorrect, the Court agrees with counsel for the Defendant that the jury's precise finding was that the Defendant failed to prove by clear and convincing evidence each element of the defense of insanity. *See* Final Jury Instructions (entered April 4, 1995); Verdict Form (entered April 4, 1995).

## II. OBJECTIONS THAT AFFECT THE GUIDELINE RANGE

1) *The Court Finds that the PSR Properly Places the Base Offense Level for Attempted Murder at 28, Pursuant to U.S.S.G. § 2A2.1(a)*

█ The Defendant cursorily objects to the PSR's calculation of the base offense level with respect to Counts One, Six, Seven, Eight, and Ten. Section 2A2.1(a) provides that the base offense level for a crime of assault with intent to commit murder or attempted murder is 28 if the object of the offense would have constituted first degree murder; otherwise, it is 22. U.S.S.G. § 2A2.1(a). Asserting that the object of the offense in this case would not have constituted first degree murder, the Defendant submits that the proper offense level is 22 rather than 28. The Court is unpersuaded by this argument.

Application Note 2 to § 2A2.1 provides that "first degree murder" means conduct that would constitute first degree murder under 18 U.S.C. § 1111. That section defines first degree murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a) (1988). In reaching its verdict on Count One, the jury found that the Defendant had the specific intent to kill the President of the United States. *See* Verdict Form, entered April 4, 1995; Final Jury Instructions, entered April 4, 1995, at 18. Accordingly, pursuant to § 1111, the object of the offense would have constituted first degree murder.

The application of the base offense level of 28 to this case thus appears relatively straightforward, and defense counsel offers no reasons supporting their assertion that the object of the offense would not have constituted first degree murder. Accordingly, the Court finds that the PSR properly calculates the base offense level at 28. To the extent that the Defendant is implicitly re-raising the impossibility argument addressed in his Motion for Judgment of Acquittal on Count One at the close of the Government's case-in-chief, the Court has already rejected this argument for the reasons set forth in its Memorandum Opinion entered April 18, 1995, and shall not repeat them here. *United States v. Duran,* 884 F.Supp. 577 (D.D.C. 1995).

2) *The Court Finds that the Enhancement for Official Victim Under U.S.S.G. § 3A1.2(a) Was Appropriately Applied in this Case*

█ Section 3A1.2(a) applies if the victim was a government official, and the offense of conviction was motivated by such status. Again, the Defendant asserts that a three-point adjustment for an "official victim" under U.S.S.G. § 3A1.2(a) is not warranted because Dennis Basso was the actual victim in this case and not the President of the United States. In view of the jury's finding that the Defendant committed each and every element of the offense of attempted murder of the President of the United States, however, the Court finds that the three-level enhancement for an "official victim" was properly applied. Again, to the extent that this objection belabors the Defendant's impossibility argument, the Court refers to its Memorandum Opinion entered April 18, 1995, which addressed this issue in detail. The Court further notes that, as discussed below, Application Note 2 to § 3A1.2 expressly provides that the President, *"although covered by this section,"* does not represent the heartland of the conduct covered, such that an upward departure from the three-level adjustment is warranted. U.S.S.G. § 3A1.2, Application Note 2 (emphasis added). To posit that,

notwithstanding this language, the three-level adjustment would not even apply is insupportable.

### 3) *The Court Finds that U.S.S.G. § 2A2.4 (Obstructing and Impeding Officers), and Not § 2A2.2 (Aggravated Assault) Properly Applies to Counts Two, Three, Four and Five*

The Defendant next objects to the application of U.S.S.G. § 2A2.2 for aggravated assault on a federal officer in connection with Counts Two, Three, Four, and Five. In particular, the Defendant asserts that § 2A2.4(a) for obstructing or impeding officers should apply instead. The Court agrees that the PSR is incorrect on this issue.

Application Note 1 to § 1B1.2 sets forth the appropriate guidance for the Court in these circumstances:

> As a general rule, the court is to use the guideline section from Chapter Two most applicable to the offense of conviction.... When a particular statute proscribes a variety of conduct that might constitute the subject of different offense guidelines, the court will determine which guideline section applies based upon the nature of the offense conduct charged in the count of which the defendant was convicted.

U.S.S.G. § 1B1.2, Application Note 1.

Under this provision, either guideline section could arguably apply. The Defendant was charged and convicted of violating 18 U.S.C. § 111(a)(1) & (b), which proscribes assault on a federal official while engaged in the performance of official duties. The jury was charged that the Government must prove, in pertinent part, that the Defendant forcibly assaulted or impeded or intimidated or interfered with the individual Secret Service Officer named in a particular count. *See* Final Jury Instructions, entered April 4, 1995, at 23. The verdict form did not provide for a space whereby the jury could indicate which of these specific acts it found the Defendant to have committed. *See* Verdict Form, entered April 4, 1995. Moreover, the Court determined prior to trial that assault is a general intent crime, *see* Order entered March 20, 1995, while Application Note 1 to § 2A2.2 provides that " 'aggravated assault' means a felonious assault that involved ... a dangerous weapon *with intent to do bodily harm....*" U.S.S.G. § 2A2.2, Application Note 1 (emphasis added). There was no evidence presented to indicate that the Defendant saw the Secret Service Officers, or that he clearly knew they were on the lawn. Rather, the evidence affirmatively showed that the Defendant was shooting at Mr. Basso, a man on the lawn who resembled the President of the United States, and at the White House itself. As any ambiguity should be resolved in the Defendant's favor, the Court finds that the appropriate guideline provision is § 2A2.4. *See Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985).

Accordingly, the Court determines that six is the proper base offense level for each of Counts Two through Five. A three-level adjustment applies pursuant to § 2A2.4(b)(1) because a dangerous weapon was involved. Accordingly, the Court concludes that the proper adjusted offense level is nine for each of Counts Two through Five. As a result of the multiple-count adjustment formula set forth in U.S.S.G. § 3D1.4, however, this finding has no effect on the total offense level applicable in determining the guideline range. *See* PSR at ¶¶ 61–64; *infra* note 1.

### 4) *The Court Finds that Application of the Three–Point Adjustment Under U.S.S.G. § 3A1.2(b) is Inappropriate in View of the Court's Determination that § 2A2.4(b)(1) Applies*

The Defendant objects to the application of a three-point enhancement to the assault counts under § 3A1.2(b). Because the base offense level for obstructing or impeding officers under § 2A2.4 "reflects the fact that the victim was a governmental officer performing official duties," the Court agrees that application of the official victim enhancement is inappropriate. U.S.S.G. § 2A2.4, Application Note 1. The official commentary plainly states that § 3A1.2 (Official Victim) is not to be applied unless the offense level is determined under § 2A2.2 (Aggravated Assault). As the Court found above that § 2A2.4 is the appropriate provision for determining the base offense level,

the official victim enhancement does not apply and the adjusted offense level is nine for each of Counts Two, Three, Four and Five. Again, however, this finding does not impact the total offense level used for purposes of determining the guideline range.

### III. UPWARD DEPARTURE FROM THE SENTENCING GUIDELINE RANGE

█ As a preliminary matter, the Court observes that the statutory maximum penalty on Count One for attempting to kill the President in violation of 18 U.S.C. § 1751 is life imprisonment. In this case, the appropriate adjusted offense level for the Defendant's conviction on Count One is 31 in light of the Court's findings regarding the application of U.S.S.G. §§ 2A2.1(a) and 3A1.2(a). *See* PSR at ¶ 4. As it is undisputed that the Defendant's criminal history category is III, *see* PSR at ¶ 76, the sentencing guideline range for Counts One through Eight, and Ten[1] is 135 to 168 months imprisonment. PSR at ¶ 116. In addition to any sentence imposed on these counts, a ten-year consecutive term of imprisonment must be imposed on Count Nine, pursuant to 18 U.S.C. § 924(c). *See* PSR at ¶ 114.

As set forth below, however, the Court finds that a nine-level upward departure is warranted in this case, bringing the offense level up to 40 and placing the Defendant within the sentencing range of 360 months to life. The Court further finds that an appropriate sentence for this Defendant on Counts One through Eight, and Ten is 360 months imprisonment. With the mandatory ten-year consecutive term on Count Nine imposed, the Defendant shall be imprisoned for a total term of 480 months.

In reaching this conclusion, the Court observes that 18 U.S.C. § 3553(b) allows courts to impose a sentence outside the range set forth in the United States Sentencing Guidelines if the Court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). *See also* U.S.S.G. § 5K2.0; *United States v. Fadayini,* 28 F.3d 1236, 1241–42 (D.C.Cir.1994); *United States v. Clark,* 8 F.3d 839, 842 (D.C.Cir.1993). Section 3553(b) goes on to direct that "[i]n determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b).

The Court finds that this case squarely fits within the standards set forth in § 3553(b). Indeed, the very same guidelines which dictate the initial sentencing range applicable to the Defendant's case expressly recognize that an upward departure is warranted under circumstances such as those presented here. In particular, U.S.S.G. § 3A1.2, Application Note 2 and § 2A2.1, Application Note 3 support the Court's decision to depart upward from the guideline range applicable in this case.

In his "Memorandum in Aid of Sentencing and Opposition to Prosecution's Motion for Upward Departure," defense counsel aptly writes that "[i]n imposing a sentence on Mr. Duran, the Court must consider the serious offenses of which he was convicted." Defendant Duran's Memorandum in Aid of Sentencing and Opposition to Prosecution's Motion for Upward Departure, at 5. This is exactly what the Court has done in reaching its conclusion that a nine-level departure is necessary.

### 1) An Upward Departure is Appropriate Pursuant to U.S.S.G. § 3A1.2, Application Note 2, Because the Victim of the Attempted Murder Was the President of the United States

█ As explained above, U.S.S.G. § 3A1.2(a) provides for a three-level increase

---

1. More specifically, Counts One, Six, Seven, Eight and Ten are grouped together, pursuant to U.S.S.G. § 3D1.2(b), because they involve the same victim (the President of the United States) and involve two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. Pursuant to U.S.S.G. § 3D1.3(a), the offense level is based on Count One, which produces the highest offense level of the counts in the group. Thus, U.S.S.G. § 2A2.1 is the applicable guideline for this count group. *See* PSR at ¶ 29. As a result of the multiple count adjustment formula set forth in U.S.S.G. § 3D1.4, no additional penalty is mandated for the convictions on Counts Two through Eight. *See* PSR at ¶¶ 61–64.

in the offense level if, as here, the victim of the offense was a government officer or employee, and the offense of conviction was motivated by such status. The PSR adjusted offense level of 31 properly reflects this three-level increase. *See* PSR at ¶ 34. The Court finds, however, that an upward departure in addition to the three-level increase is appropriate in this case. In particular, U.S.S.G. § 3A1.2, Application Note 2, provides that:

Certain high level officials, *e.g.*, the President and Vice President, although covered by this section, do not represent the heartland of the conduct covered. *An upward departure* to reflect the potential disruption of the governmental function in such cases *typically would be warranted.*

(Emphasis added). Thus, the official commentary to U.S.S.G. § 3A1.2 makes clear that the President's involvement in the Defendant's crime constitutes a mitigating circumstance of a kind not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. Accordingly, the Court finds that an upward departure of five offense levels is warranted. *See United States v. McAninch*, 994 F.2d 1380, 1385 n. 6 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 394, 126 L.Ed.2d 342 (1993) ("[U]nder the guidelines currently in effect, if the President is a victim, the sentencing court must add three points to the offense level, and may depart upward beyond that.").

The most recently reported decision regarding a crime against the President of the United States upheld a three-level enhancement plus a three-level upward departure in sentencing. *U.S. v. Hines*, 26 F.3d 1469 (9th Cir.1994). The defendant in *Hines* was sentenced under the 1991 United States Sentencing Guidelines, which state that "the court should make an upward departure of *at least three levels* in those unusual cases in which [the President is a] victim." *Id.* at 1476 (citing U.S.S.G. § 3A1.2(a), comment, (n. 2) (1991)). Hines had stolen a revolver and travelled to Washington, D.C. to kill President Bush in order to become famous. *Id.* at 1472. Although Hines sent a letter indicating his intent to kill the President and later pled guilty to making threats against the President and possessing a firearm as a convicted felon, he did not shoot at anyone. *Id.* at 1473. In light of the three-level departure imposed for Hines' activity, the Court finds a five-level departure is clearly warranted to account for the seriousness of Duran's behavior.

The Defendant's methodical planning of the attempt on President Clinton's life evidenced by the testimonial and documentary evidence presented at trial was, in a word, chilling. Both David Millis and Stacy Stallwood testified that, while in Colorado, the Defendant spoke of his desire to kill the President, and this desire was confirmed by the virtual trail of written materials left by the Defendant which threatened the life of the President and other government officials.[2] *See* Testimony of David Millis, Tr. at 14, 17 (March 21, 1995); Testimony of Stacy Stallwood, Tr. at 193, 195 (March 20, 1995). Having falsely indicated on Alcohol, Tobacco and Firearms Form 4473 that he had not been convicted of a felony or dishonorably discharged from the military, and using a credit card he cleared in advance of his trip, the Defendant bought a Norinco SKS semiautomatic assault rifle, multiple round clips, a Mossberg .410 gauge shotgun, multiple rounds of ammunition, a trench coat to con-

---

**2.** Such materials, all of which were written in the Defendant's handwriting and/or contained his fingerprints, included a road atlas containing the statement "Kill the Pres!" (Govt's Exh. 178); a letter with the statement "[c]an you imagine a higher moral calling than to destroy someone's dreams with one bullet" (Govt's Exh. 179); a Sears business card with the phrase "Kill All Government Offices and Department Heads" written on the back (Govt's Exh. 187); a note containing the statement "Waging War towards ... The U.S. Government + it's Agentcies [sic]." (Govt's Exh. 189); a Duran's Upholstery business card with the statement "Time to take Our Country Back" and the Defendant's signature on the back (Govt's Exh. 209); a Duran's Upholstery business card with the statement "Death to all Government Officials" and the Defendant's signature on the back (Govt's Exh. 210); a handwritten letter on Embassy Suites stationery containing the statement "the Revolution starts today ... because of the F[——]ing Government" (Govt's Exh. 215); and a yellow pages directory with a picture of President Clinton on the cover, his head circled with an "X" drawn through it (Govt's Exh. 219).

ceal the assault weapon, and a folding stock and pistol grip for the firearm so it could be hidden under the coat. Armed accordingly, the Defendant headed to the President's house in Washington, D.C. and waited outside for hours. Seconds after schoolchildren mistook a man on the White House lawn for President Clinton, the Defendant opened fire in the man's direction. The evidence showed that the Defendant's intent and object, in addition to killing the President, was to start a revolution that would result in anarchy. *See* Govt's Exh. 190, 209, and 210.

On this subject, the Court observes that the statement of Mr. Ronald Noble, Undersecretary for Enforcement in the Department of Treasury, which was provided to the U.S. Probation Office in response to a letter directed to President Clinton, bears repeating:

> The commission of [Attempted Murder of the President of the United States] threatens the heart of our democracy—the institution of the Presidency. Moreover, in a society that has become increasingly violent, the location of the offense at the White House—"the People's House"—was especially disturbing. This incident was the first shooting directed at the White House in over 150 years. The White House is a symbol of our very nation and the American people. Indeed, the Department of the Treasury has received numerous messages from citizens across the country expressing their outrage at this offense and their concern for the safety of the President and the First Family, and for the security of the White House. Thus, Duran's actions were an assault on all people of this nation, as well as an assault on the President of the United States. Consequently, I believe that his punishment should be severe.

PSR at ¶ 24.

 The Defendant's conviction of attempted murder of the President is precisely the kind of circumstance which the Sentencing Commission envisioned would warrant a departure under 18 U.S.C. § 3553(b) and, with remarkable specificity, under U.S.S.G. § 3A1.2, Application Note 2. In convicting the Defendant on Count One, the jury found that the Defendant had the specific intent to kill President Clinton, and the evidence showed that the Defendant believed that he had the President in view when he began shooting. *See* Testimony of Robert DeCamp, Tr. at 170–71 (March 22, 1995) (Defendant started firing "almost immediately" after DeCamp said Mr. Basso looked like President Clinton); Testimony of Brent Owens, Tr. at 184–85 (March 22, 1995) (Defendant aimed and started firing "[j]ust a couple seconds" after DeCamp pointed at Mr. Basso and said he looked like President Clinton); Testimony of Norma Klein, Tr. at 197 (March 22, 1995) (Defendant shot at Mr. Basso and the others in his tour group); Testimony of Mark Sofia, Tr. at 192 (March 22, 1995) (heard a woman say, "[T]hat looks like Bill Clinton," or "There is Bill Clinton."); and Testimony of Dennis Basso, Tr. at 48 (March 23, 1995) (saw leaves falling above his head and poofs of dirt from the ground; thought he was being shot at). Clearly, attempted assassination of the President of the United States falls outside the heartland of cases covered by §§ 2A2.1(a) and 3A1.2(a).

The Court further observes that, if the Defendant had succeeded in murdering the President of the United States, a substantial disruption to the government function would have resulted. Indeed, as a consequence of his failed attempt on the President's life, the Defendant caused $3,200 in damage to the White House and the grounds and trees surrounding it. *See* Testimony of Gary J. Walters, Tr. at 191 (March 21, 1995). Considering the Defendant's evil motive, the planning that went into the crime, the severity of the crime of attempting to kill the President, and the disruption of government function that could have resulted, the Court finds that an upward departure of five levels is entirely appropriate.

2) *An Upward Departure is Also Warranted Under U.S.S.G. § 2A2.1, Application Note 3, as the Defendant Created a Substantial Risk of Death or Serious Bodily Injury to More than One Person*

 The circumstances leading up to the Defendant's conviction on Count One of the Superseding Indictment also warrant an up-

ward departure pursuant to U.S.S.G. § 2A2.1, Application Note 3. As set forth above, section 2A2.1 provides that attempted murder has a base offense level of 28 if, as here, the object of the offense would have constituted first degree murder. However, the official commentary to that section also states that:

> If the offense creates a substantial risk of death or serious bodily injury to more than one person, an upward departure may be warranted.

U.S.S.G. § 2A2.1, Application Note 3. In view of this language, the Court finds that the risk to others created by the assassination attempt was a circumstance not adequately considered by the Sentencing Commission which should result in departure. *See United States v. Carpenter,* 914 F.2d 1131, 1134 (9th Cir.1990) (observing that the guideline offense level under U.S.S.G. § 2A2.1 is "predicated upon the risk to a single victim" and "does not consider the risk of harm to multiple victims"). Accordingly, the Court shall depart upward four levels on this basis. *See United States v. McCraw,* 1992 WL 73171 (9th Cir.1992) (upholding four-level upward departure for the restraint of multiple victims during bank robbery); *United States v. Johnson,* 931 F.2d 238 (3d Cir.1991) (approval of three-level increase on ground that three victims were assaulted); *United States v. Carpenter,* 914 F.2d 1131 (9th Cir.1990) (upholding three-level upward departure for risk of harm to three children and others where murder plot was foiled and no shots were fired); *United States v. Cole,* 817 F.Supp. 1406 (W.D.Mich.1993) (imposing eight-level upward departure for endangering the safety of others by placing pipe bomb in van which exploded near store where employees were changing shifts); *United States v. Huddleston,* 929 F.2d 1030 (5th Cir.1991) (upholding seven-level departure for reckless endangerment to community by improperly hauling explosives through residential areas); *United States v. Doe,* 18 F.3d 41 (1st Cir. 1994) (upholding two-level increase for endangering lives in high speed chase). *Cf.* U.S.S.G. § 2F1.1(b)(2) (mandating two-level

enhancement if scheme to defraud multiple victims).

In this case, the Defendant discharged a Norinco SKS semi-automatic assault rifle twenty-nine times in the direction of the White House on October 29, 1994, directly placing at risk of death or serious bodily injury numerous persons. Particularly jeopardized were Dennis Basso, the man whom the Defendant mistook for President Clinton, as well as the three other individuals standing on the north grounds of the White House. Indeed, the evidence showed that a concentration of bullets discharged from the Defendant's weapon impacted the building and trees in the general area where the tour group was standing. *See* Govt's Exh. 61–64.

The Defendant's actions also placed United States Secret Service Uniformed Division Officers Tejeda, Persons, Coffey and Wilson in serious danger, and the Court finds that an upward departure is warranted to account for the Defendant's assault on these officers.[3] These men have dedicated their lives to protecting the safety of the President and the First Family. According to the PSR, the Defendant's actions left the families of at least two of the assaulted Secret Service Officers with increased stress and anxiety levels due to the crime, and one Officer requested to speak with a counselor from the Employment Assistance Program and was granted three days of administrative leave. PSR at ¶¶ 25–26.

Finally, and of particular concern to this Court, the Defendant's shooting spree placed at risk of death or serious bodily injury a large number of citizens, including many children, that were on the sidewalk adjacent to the White House when the Defendant began firing. *See* Govt's Exh. 146 and 147. Due to the unseasonably warm weather, the sidewalk in front of the White House was particularly crowded with tourists that day. The Court vividly recalls a scene from one of the videotapes admitted into evidence in which an adult, in close proximity to the Defendant, ran from the shooting with a young child in a stroller. Thereafter, when a courageous citizen named Harry Rakosky tackled the De-

---

**3.** Absent departure, the Defendant is not punished separately for the convictions of forcible assault on these officers under the Guidelines. *See* PSR ¶¶ 61–64.

fendant, the Defendant swung the SKS rifle around such that it jammed into Mr. Rakosky's abdomen. *See* Govt's Exh. 146A; Testimony of Harry Rakosky, Tr. at 215–16 (March 22, 1995). At the time Mr. Rakosky intervened, the Defendant was attempting to reload the rifle with an additional fully-loaded thirty round ammunition clip. *See* Govt's Exh. 146A, 148; Testimony of Harry Rakosky, Tr. at 214 (March 22, 1995).

Upon consideration of these facts and all the evidence in this case, the Court finds that the risk of death or serious bodily injury to Mr. Basso, the others in the tour group, and the four Secret Service Officers, along with monumental threat to the public posed by the Defendant's conduct, warrants a four-level upward departure under U.S.S.G. § 2A2.1, Application Note 3.

3) ***The Court Finds that an Upward Departure of Nine Levels and the Imposition of Sentence at the Low End of the Resulting Guideline Range is Proper Under U.S.S.G. § 1B1.4***

For the foregoing reasons, the Court finds that an upward departure of nine levels is warranted. The resulting offense level of 40 yields a sentencing range of 360 months to life. The Court further finds that a sentence at the lowest end of this range, 360 months, plus the mandatory ten-year sentence on Count Nine, is proper. In reaching this conclusion, the Court refers to U.S.S.G. § 1B1.4, which states:

> In determining the sentence to be imposed within the guideline range, or whether departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.

As a preliminary matter, the Court observes that this provision lends further support to the Court's decision to depart nine levels. As set forth in detail in the PSR, the Defendant's background includes a prior conviction for aggravated assault. PSR at ¶ 71. The Defendant struck two pedestrians with an automobile, and the "woman sustained serious injuries where her skull was fractured in the right occipital region causing her to be hospitalized." *Id.* The Defendant's conduct in this case occurred less than one year after his release from prison on the previous assault conviction.

The Defendant also made false statements to the government by misrepresenting on Alcohol, Tobacco and Firearms Form 4473 that he had not been convicted of a felony or discharged from the military. *See* PSR at ¶¶ 6, 8, 9. By so doing, the Defendant illegally purchased a handgun, a semi-automatic assault rifle, a shotgun, and numerous rounds of ammunition, most of which he brought with him to Washington. *See* Govt's Exh. 162–64.

Based on the entire record herein, the Court further finds that the Defendant poses a severe danger to himself and others. The jury's rejection of his defense of insanity indicates that he manipulated his symptoms to feign insanity at trial. Moreover, the Defendant's writings exhibit an extraordinarily dangerous mental state involving homicidal and sexual fantasies. *See* Govt's Exh. 179 and 167. Under such circumstances, a longer term of incarceration than that provided by the guideline range is appropriate.

Finally, the Court reiterates that the evidence was replete with indications of the Defendant's extreme hatred of the government and ardent wish for revolution and anarchy. While in Colorado, the Defendant often listened to anti-government talk shows, including Rush Limbaugh, and told his co-workers of his desire to kill government officials. *See* Testimony of Lisa Taylor, Tr. at 57, 58, 62, 63 (March 21, 1995); Testimony of David Millis, Tr. at 14, 17 (March 21, 1995); Testimony of Stacy Stallwood, Tr. at 193, 195 (March 20, 1995). Thereafter, the Defendant planned and executed his assassination attempt in a deliberate and calculated way. This is not a man who can be trusted to keep from endangering others' lives in the future.[4]

Notwithstanding all of these reasons for departing nine levels above the guideline

---

**4.** The Court observes that the Sentencing Guidelines provide additional grounds for departure to reflect the likelihood that the Defendant will commit other crimes. *See* U.S.S.G. § 4A1.3.

range, however, the Court disagrees with the Government's position that a life sentence without parole is warranted. While the Government cites to *United States v. Moore*, 599 F.2d 310, 315 (9th Cir.1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 687, 62 L.Ed.2d 658 (1980), to support its argument, Moore's life sentence for shooting President Ford was imposed prior to passage of the Comprehensive Crime Control Act of 1984, such that the defendant likely had the possibility of parole after ten years. *See* 18 U.S.C. 4205(a) (providing for possibility of parole after ten years of a life sentence), *repealed by* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat.1987 (mandating that all sentences of imprisonment shall be for fixed terms, *see* 18 U.S.C. §§ 3581, 3582(a) (1982 ed., Supp. IV), and eliminating the possibility of release on parole prior to the end of a sentence, §§ 3621(a), 3624(a)). This also appears to have been the case with Lynette Alice Fromme who was sentenced to life imprisonment for pointing a gun at President Ford. *See* Government's Motion for Upward Departure From Sentencing Guideline Range, Exh. A.

■ Rather, the Court finds that a 360 month sentence with an additional 10 years for Count Nine does satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553, *i.e.*, the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner....

18 U.S.C. § 3553(a)(2).

If the Defendant complies with the requisite institutional disciplinary regulations so as to earn credit for satisfactory behavior under 18 U.S.C. § 3624(b)(1), he will be approximately sixty years old when he is released. The Court cannot ignore the evidence on the record suggesting that this 26–year–old man at one time "was capable of leading a positive and productive life," as defense counsel submits. (Defendant's Memorandum at 11). In view of the seriousness of the offense, however, and the other factors set forth herein, the Court finds that the Defendant must be incapacitated for a substantial period of time. *See Moore*, 599 F.2d at 315 (citing "enormity" of offense and potential for deterrence as reasons for imposing life sentence for attempted murder of the President). The Court finds that imposition of the lower end of the sentencing range which results from the nine-level upward departure, plus 120 months for Count Nine and five years supervised release, serves the goals of sentencing, as well as the ends of justice.

### CONCLUSION

For the foregoing reasons, and pursuant to the Sentencing Reform Act of 1984 and the application of the United States Sentencing Commission Guidelines, the Defendant, Francisco Martin Duran, shall be, and hereby is, committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 360 months on Count One, followed by a five-year period of supervised release, together with a special assessment of $50. This sentence represents an increase of nine levels to offense level 40 and criminal history category III.

As to each of Counts Two, Three, Four, Five, Six, Seven, Eight and Ten, the Defendant shall be, and hereby is, committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 120 months, followed by a three-year period of supervised release, together with a special assessment of $50. These sentences are to run concurrent with each other and concurrent to Counts One and Nine. With respect to Count Eight, the Defendant shall also pay restitution in the amount of three-thousand two-hundred dollars ($3,200) within five years of this date, to be paid during the period of incarceration through the United States Bureau of Prisons' Inmate Financial Responsibility Program.

As to Count Nine, the Defendant shall be, and hereby is, committed to the custody of

the United States Bureau of Prisons to be imprisoned for a term of 120 months, followed by a three-year period of supervised release, and a special assessment of $50. This sentence is to run consecutive to all other counts.

Accordingly, the total sentence is 480 months, followed by a five-year period of supervised release, and a $50 special assessment for each count of conviction for a total of $500, along with $3,200 in restitution. Within 72 hours of release from the custody of the United States Bureau of Prisons, the Defendant shall report, in person, to the Probation Office in the district in which he is released.

While on supervised release, the Defendant shall not commit any state, federal, or local crimes, and shall abide by the standard conditions of supervised release as recommended by the United States Sentencing Commission and such further orders as the Probation Officer to whom this case is assigned or the Court may from time to time issue. The Defendant shall comply with the following special conditions: (1) he shall not possess a firearm or any other dangerous weapon or device for any reason; and (2) he shall pay the $500 special assessment within five years of this date through the United States Bureau of Prisons' Inmate Financial Responsibility Program.

Lastly, since the Court finds that the Defendant does not have the ability to pay a fine, or the costs of incarceration or supervision, these sanctions will not be imposed. This is the judgment and sentence of the Court.