942 F.2d 105
 68 A.F.T.R.2d 91-5588
 UNITED STATES of America, Appellee,
v.
Thomas H. HORNICK, Dolores Hornick, Hastings, Youket, M.
Merrill Miller, Frank J. Marano and Richard T.
Gow, Defendants,
Thomas H. Hornick, Dolores Hornick, M. Merrill Miller and
Frank J. Marano, Defendants-Appellants.
 Nos. 1369, 1222 and 1223, Dockets 90-1112, 90-1113 and 90-1115.
 United States Court of Appeals,
Second Circuit.
 Argued May 13, 1991.
Decided Aug. 7, 1991.
 
 Marjorie M. Smith, New York City (Legal Aid Soc., Federal Defender Services Appeals Unit, of counsel), for defendant-appellant Thomas Hornick.
 Stephen A. Sutter, Binghamton, N.Y., for defendant-appellant Frank J. Marano.
 John A. Cirando, Syracuse, N.Y. (Patrick J. Haber and Ivette Iza, D.J. & J.A. Cirando, of counsel), for defendant-appellant Delores Hornick.
 Gary S. Sharpe, Asst. U.S. Atty., Binghamton, N.Y. (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., of counsel), for appellee the U.S.
 Before CARDAMONE, WALKER and FRIEDMAN,* Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Thomas J. Hornick and Delores Hornick, his wife, and Frank J. Marano appeal from judgments of conviction entered in the United States District Court for the Northern District of New York (McAvoy, J.) after a jury trial. Thomas Hornick was found guilty of mail, wire and travel fraud, various crimes involving false tax returns, an obstruction of justice count, mailing a threatening letter and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 2314; 26 U.S.C. § 7206(2); 18 U.S.C. §§ 371, 1503 and 2, and 876 respectively. His wife Delores was convicted on most of the same charges. Frank Marano was convicted of fraud and conspiracy counts in violation of 18 U.S.C. §§ 1341 and 2, and 8 U.S.C. § 371.
 
 
 2
 Some would-be investors, driven first by greed that blinds them to the promptings of common sense, and then by fear, when reality inevitably intrudes, are the victims of the defendants before us on this appeal. By appealing to the victims' desire to make money without risk, the defendants, who were unscrupulous promoters, were able to sell their victims a get-rich scheme. The investors had the momentary pleasure of believing themselves discoverers of a sure path to wealth by investing in oil wells, an emotion that was swiftly supplanted by fear of loss when it became clear they had been hoodwinked and defrauded out of millions.
 
 BACKGROUND
 
 3
 In 1984 defendants Thomas and Delores Hornick, together with defendant Frank Marano and several other defendants, began to sell to small investors limited partnerships in oil well projects. Promoting the partnerships through direct sales contracts, solicitation documents, radio advertisements, newsletters, and investment seminars, which emphasized Thomas Hornick's background and experience as a former Internal Revenue Service agent, they touted the tax advantages of investing in the limited partnerships. Frank Marano, a financial planning consultant and salesman in 1985 and sales manager in 1986, participated in direct sales presentations and seminars, reviewed the newsletters, and handled correspondence. Hornick's wife, Delores, attended the seminars and served as an employee or officer of some of the corporations involved in the complex scheme.
 
 
 4
 Defendants promised investors their money would be used exclusively to drill wells and that oil production revenues would return their investment in one to three years. Representing that defendants' sole profit would be 20 percent of the revenue derived from the actual production of oil, the literature and the seminars offered investors a written, money-back guarantee if the wells failed, or an option to transfer the investment to a producing well. The promoters also claimed these were virtually risk-free investments, and that those that bought in would have a tax sheltered write-off of up to 80 percent of the money invested.
 
 
 5
 Defendants typically mailed out $100-$300 checks, characterized as either pre-production payments or as profits from the investment, in order to keep investors satisfied that their money had been invested and was generating income. They also periodically "bought-out" investors, though the money used to issue pre-production checks and the money used to "buy-out" investors was actually money invested in the oil well scam by other investors.
 
 
 6
 During the four years of the limited partnership the defendants told investors the projects had 37 straight successes, even though the amount of oil the wells actually generated was minuscule. The actual cost of drilling was never disclosed. Investor funds were commingled in single bank accounts and no accounting was ever given. One project was double-sold under different names, a limited partnership agreement was never filed, and the wells were registered in the state of Texas under one name and sold to investors under another. The defendants also filed partnership tax returns fraudulently claiming deductions for intangible drilling costs and equipment expenses, and caused investors to file false tax returns by sending them inaccurate information regarding their allowable share.
 
 
 7
 Most of the money obtained was not used to drill wells. The Hornicks deposited it instead in a number of bank accounts owned by corporations that they had set up, and later withdrew the investors' money and redeposited it in Delores Hornick's personal account. Out of the money generated by this swindle, only $1.1 million was actually spent on oil drilling. The 20 percent profit investors were told the promoters would be entitled to amounted only to $110,000. But from 1984 until the defendants were indicted in 1988 approximately $1.3 million went into the pockets of Delores Hornick, who spent the money on boats, jewelry, travel, and expensive automobiles.
 
 
 8
 The Hornicks and Marano have raised numerous issues on this appeal, among them challenges to the sufficiency of the evidence and to the jury instructions, a claimed denial of effective assistance of counsel, denial of the right to cross-examination, and errors in the calculation of their sentences. All of them save one are without merit and warrant no discussion; the one issue to be analyzed arises from the sentence imposed on defendant Thomas Hornick for sending threatening communications.
 
 DISCUSSION
 Sentencing Guidelines
 
 9
 After investors began to bring suit against the defendants, Hornick sent letters out to other investors seeking $500 contributions toward his legal defense. When the response to this plea proved insufficient, he tried a different approach, writing that
 
 
 10
 During a series of investor meetings in Binghamton, N.Y. the matter was brought up that it was not fair that a few investors must spend personal funds to defend non-contributing investors interests in the wells. There was unanimous consent at all meetings that all investors must either contribute or face the loss of their entire investment by lapse of the lease or foreclosure of their interests in the wells. Centex will take appropriate action should you decide not to contribute to our fund.
 
 
 11
 The district court found that by mailing out these letters, Hornick had committed the offense of sending threatening communications, which carries a base offense level of 12 under Sentencing Guideline § 2A6.1(a). The sentencing judge increased that offense level to 18 because he concluded that Hornick had "engaged in conduct evidencing an intent to carry out [the] threat." U.S.S.G. § 2A6.1(b)(1).
 
 
 12
 Adopting the recommendation of the presentence report, Judge McAvoy stated that a letter dated July 14, 1988 had been sent to an investor named Howard Baumel, and when he failed to pay, Hornick double-sold his interest. The presentence report noted that Hornick specifically denied this allegation, and Hornick's counsel objected at sentencing to this finding. Defendant does not deny that he double-sold Baumel's interest, but says he did it in May 1987, before he sent the letter dated July 14, 1988. He argues that such action plainly may not serve as proof of an intent to carry out a threat he had not yet made. The government concedes the validity of Hornick's version of the facts. Its proof at trial of double-selling was provided by witness Elmer Shaw, who testified that during a visit to Texas in May 1987 he discovered that the sign on the wellsite in which he had invested--the same well in which Baumel had invested--carried a different name than the one under which he had been led to believe it carried at the time he had invested. Shaw's discovery forced the defendants to admit to him they had double-sold the well.
 
 
 13
 The district court did not make a specific finding of fact as to when the well had been double-sold. If it had found the well in which Baumel had invested was double-sold after the threatening letter was mailed, such a finding would be clearly erroneous given the record at trial. See United States v. Lara, 905 F.2d 599, 602 (2d Cir.1990); United States v. Rodriguez-Gonzalez, 899 F.2d 177, 182 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). If, on the other hand, the district court believed the well was double-sold before the letter was sent, but that the letter still constituted conduct evidencing an intent to carry out the threat, then the question whether conduct occurring before a threat has been made may evince an intent to carry out that threat is one of law that we review de novo. See Lara, 905 F.2d at 602; United States v. Shoulberg, 895 F.2d 882, 884 (2d Cir.1990).
 
 
 14
 A person cannot take action that will constitute proof of his intent to carry out a threat until after the threat has been made. The Background Commentary to § 2A6.1 states the seriousness of conduct constituting threatening communications depends on the defendant's intent and the likelihood that he would carry it out. The tense is future conditional, suggesting the guidelines contemplate a future, not a past, event. In addition, the use of the words "to carry out" makes clear that the threat must first exist before it may be carried out.
 
 
 15
 The government contends that because under contract law Baumel still had his interest--despite the fact that Hornick double-sold it--the threat was still real and Hornick's past conduct indicated that he was prepared to carry it out. This argument is not persuasive. If prior to the actual making of a threat, the government might scour a defendant's past to unearth some incident that might point to an intent on defendant's part to carry out a threat he made later, an upward adjustment would become almost automatic, and would bear only a tenuous relationship to the primary conduct at issue--the threat itself. We think the plain language of the guideline provides that the conduct needed to show an intent to carry out a threat must occur either contemporaneously with or after the threat. Therefore, the district court erred when it increased Hornick's offense level to 18 under § 2A6.1(b)(1) of the Guidelines.
 
 Hornick's Sentence
 
 16
 Hornick was sentenced to a total of 133 months imprisonment, 97 months on counts under the sentencing guidelines and 36 months on the non-guideline counts, to be followed by a three-year term of supervised release. The district court also ordered restitution and imposed a special assessment. In calculating the sentence, the court placed Hornick's offenses into three groups--one for the wire and mail fraud and conspiracy to commit those offenses (adjusted offense level 25), one for conspiracy to impede the lawful function of the Internal Revenue Service (offense level 22), and one for sending threatening communications. It was in calculating the offense level for this last group that the court, pursuant to U.S.S.G. § 2A6.1(a), adjusted the level from 12 to 18 for evidencing an intent to carry out a threat. The court assigned two extra units as multiple count adjustments for the Groups I and II offenses, and 1/2 unit, rounded up to one unit, for the Group III offense. U.S.S.G. § 3D1.4.
 
 
 17
 If the court had not added six levels to the offense level in Group III, the offense level for that group would have been more than eight levels less serious than the Group with the highest offense level (Group I, offense level 25), and so would have been disregarded in computing the multiple count adjustment. U.S.S.G. § 3D1.4(c). As a result, Hornick's combined offense level would have been 2, not 3, and his combined adjusted offense level would have been 27, not 28. It follows that his maximum sentence would have been 87 months, 10 months less than the 97 months to which the court sentenced him for the counts falling under the sentencing guidelines. The district court could have sentenced Hornick for up to two more years on the non-guidelines counts.
 
 
 18
 The parties agree that under these circumstances a remand for resentencing is proper. It is not possible to determine whether the district court would have sentenced Hornick to additional imprisonment on the non-guidelines counts had it applied § 2A6.1 correctly. Cf. United States v. Alba, 933 F.2d 1117, 1124 (2d Cir.1991). We therefore remand for resentencing.
 
 CONCLUSION
 
 19
 Defendant Thomas Hornick's sentence is vacated and his case remanded to the district court for resentencing in accordance with this opinion. His conviction is otherwise affirmed. The convictions and sentences of defendants Delores Hornick and Frank J. Marano are affirmed.
 
 
 
 *
 Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation