**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Claude L. PHILIBERT, Defendant–
Appellant.**

**No. 90–8728.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 29, 1991.

---

Paul Kish, Federal Defender Program, Inc., Atlanta, Ga., for defendant-appellant.

F. Gentry Shelnutt, Asst. U.S. Atty., Amy Levine Weil, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before BIRCH, Circuit Judge, TUTTLE, Senior Circuit Judge, and FULLAM *, Senior District Judge.

FULLAM, Senior District Judge:

Appellant, Claude Philibert, convicted of making a threatening phone call in violation of 18 U.S.C. § 875(c), asserts in this appeal that he should be granted a new trial because crucial evidence against him should have been suppressed, the court erred in admitting evidence of other crimes, and the court erred in charging the jury. In addition, he contends his 28–month sentence was the product of an erroneous application of the Sentencing Guidelines, and that the sentencing judge erred in refusing to consider a downward departure. We agree with some, but not all, of these contentions.

* Honorable John P. Fullam, Senior U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

## I. THE FACTS

Appellant is a multilingual electrical engineer who has worked for several international engineering firms. In September, 1988, while employed by Siemens Engineering, appellant disclosed to a fellow employee, in the course of a transcontinental business trip, that he had discovered a sinister conspiracy involving the Mafia and the FBI, and that he found it advisable to carry with him a shotgun concealed in a cello case. Later that month, appellant made two late-night telephone calls, one to his supervisor, Mr. Steineke, and one to another Siemens employee, Michael Blumenthal. Appellant expressed the belief that Siemens and its employees were very "cheap"; stated that he now knew what the seventh deadly sin was, that it was murder, that the bullet was cast, that he owned a .38 and that he would be coming to Atlanta to settle his account and take care of things. A few days later, appellant appeared at the Siemens offices in Atlanta, Georgia, and asked for a leave of absence. He calmly admitted to having made the telephone calls "because he felt like it." He was granted a leave of absence and has not since returned to his employment at Siemens.

Nine months later, in June of 1989, appellant purchased over $4,000.00 worth of guns, bayonets, and ammunition from a gun dealer in Atlanta, Georgia. Included in the purchase was a Thompson submachine gun, but appellant did not take delivery of that weapon, and has never had the submachine gun in his possession. He transported the remaining weapons to his mother's home in Connecticut. Some of the time, the weapons were kept in a mobile home belonging to appellant, and at other times the weapons were stored in his mother's house.

On August 11, 1989, some fifty-three days after the weapons purchase, appellant placed a telephone call from his mother's home in Connecticut to the residence of Mr. Steineke, his former supervisor at Siemens.

Mr. Steineke's teenage daughter answered the phone and, in the course of a one-minute telephone conversation, was informed by appellant that he was a former employee of her father's and that he was coming to kill him.

Appellant was apprehended and charged with this crime as the result of a bizarre and seemingly unrelated incident: Two weeks after the phone call, on August 23, 1989, a person later identified as appellant drove up to the Federal Courthouse in Atlanta, Georgia, removed from the trunk of his vehicle the severed head of a recently-deceased horse, and deposited that object at the courthouse entrance. As it happened, the incident was filmed by a TV crew, and appellant was eventually identified from these photographs and through tracing the license plate on the vehicle.

At the time of this incident, it was reported to the FBI by one of the federal security officers stationed at the courthouse that the person who deposited the horse's head stated "This is for Barr to show we mean business"—presumably a reference to the United States Attorney for that district, Robert Barr, Esq. The FBI thereupon obtained a warrant for the arrest of appellant, charging him with the felony offense of assaulting a federal officer.

In the course of his post-arrest interview by the FBI, appellant disclosed that he had been at his mother's home in Connecticut the weeks before the incident, including the date on which the threatening phone call to Mr. Steineke's home had occurred. The FBI thereupon obtained the telephone records pertaining to appellant's mother's telephone, which established that a telephone call had been placed from that phone to the Steineke residence at the appropriate time. Without this evidence, it is unlikely that the government could have proved its case. Appellant argues that his arrest was unlawful, and that the telephone records should have been suppressed as the fruit of an unlawful arrest.

Before trial, the government made known its intention to present evidence, not only concerning the August 11 telephone call to the Steineke residence, but also (1) the horse's head incident, (2) the June 1989 purchase of weapons and ammunition, (3) the fact that police officers in Connecticut had responded to a call concerning gunshots allegedly fired in the vicinity of the home of appellant's mother on the evening of August 11, 1989, and (4) the September 1988 telephone calls from appellant to Mr. Steineke and Dr. Blumenthal. After a pretrial hearing, the court ruled that evidence concerning the purchase of weapons in June 1989 and concerning the September 1988 telephone calls would be admissible; that the Connecticut police officers would be permitted to testify that they had occasion to visit the home of appellant's mother on August 11, 1989, and that the appellant was present, but would not be permitted to refer to the gunshots, since there was no basis for attributing them to the appellant; but that evidence concerning the horse's head incident would be excluded, because its potential for prejudice far outweighed its probative value. Appellant argues that the evidence concerning his June 1989 purchases of weapons and ammunition should have been excluded, and that its admission was prejudicial error.

The base level for a violation of 18 U.S.C. § 875(c) is twelve, Guidelines, Section 2A6.1(a). But Guideline Section 2A6.1(b)(1) provides: "If the defendant engaged in any conduct evidencing an intent to carry out such threat, increase by six levels." Appellant's sentence was calculated on the basis of just such a six-level increase. Appellant contends that this increase was unwarranted, and that the court further erred by concluding that it could not lawfully consider a downward departure from the Guideline Range based upon appellant's mental condition.

## II. THE SUPPRESSION MOTION

■ Appellant contends that his arrest was unlawful, because the FBI did not have probable cause to believe appellant guilty of assaulting a federal officer. The arrest warrant was obtained on the theory that flinging the horse's head onto the top step at the entrance to the courthouse,

accompanied by a statement identifying the United States Attorney as the target of the gesture, constituted an assault or an attempted assault upon a federal officer. That theory did not long survive the arrest: further investigation disclosed that the appellant did not make any statement at all (apparently, the federal security officer who was thought to have overheard the remark had been misunderstood, and the reference to the United States Attorney represented speculation by a bystander); and it was learned that the United States Attorney was not in the building at the time. The felony charge of assaulting a federal officer was withdrawn, and appellant was charged instead with three petty offenses dealing with the depositing of items on federal property. Appellant correctly notes that, since these were petty offenses, not committed in the presence of the arresting officer, they were properly the subject of citation proceedings, and could not have formed a valid basis for issuance of an arrest warrant. *See United States v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976).

With the benefit of hindsight, it is clear that appellant was not in fact guilty of the crime for which he was originally arrested. Appellant never intended to threaten or assault the United States Attorney; the United States Attorney was not even in the building (or the city) when the incident occurred; and appellant plausibly explained he mistook the federal courthouse for a state courthouse in which his wife was suing him for divorce, and intended the horse-head episode as some sort of symbolic protest. But we are concerned with what the arresting officers could reasonably have believed at the time. If a federal official had been standing on the courthouse steps, appellant's action in flinging the horse's head in that direction would undoubtedly have constituted an assault on a federal officer. The agents were informed, and reasonably believed, that the appellant had stated that the offending object was directed at the United States Attorney; whether he was physically present or not, the officers could reasonably have

regarded appellant's action as at least an attempt to assault him.

Given the information available to the agents at the time, it may well be that a charge of threatening (rather than assaulting) a federal official might have been closer to the mark, but an arrest is not rendered unlawful merely because, having probable cause to believe the arrestee guilty of a federal felony, the officer's precise designation of the charged offense was arguably incorrect.

We conclude that the arrest warrant was supported by probable cause, and that appellant was lawfully arrested. In view of that conclusion, we need not consider whether the government obtained the incriminating telephone records as a fruit of that arrest, or whether the government would probably have ferreted out those telephone records sooner or later in any event. The suppression motion was properly denied.

## III. EVIDENTIARY RULINGS

■ Appellant is on firmer ground in asserting that the trial court erred in admitting evidence concerning appellant's purchases of weapons and ammunition in June of 1989. Appellant was on trial charged with making a threatening phone call to Mr. Steineke, his former supervisor, on August 11, 1989. Evidence that he had earlier made harassing telephone calls to Mr. Steineke and a fellow employee, containing statements which could also be reasonably interpreted as threatening, was properly admitted pursuant to Federal Rule of Evidence 404(b), since it tended to show "motive … intent … plan … knowledge … identity, or absence of mistake or accident." But the government has not explained, and we fail to perceive, any possible relevance, on the question of whether appellant did or did not place a threatening phone call to Mr. Steineke from Connecticut on August 11, 1989, of the fact that two months earlier he had purchased certain firearms. It is undisputed that when appellant did come to Georgia twelve days after making the phone call, his trip was

entirely unrelated to Mr. Steineke, and he did not bring any weapons with him.

While the evidence concerning firearms purchases may have constituted additional evidence of appellant's paranoid schizophrenia, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Federal Rules of Evidence 404(b).

Moreover, the manner in which this evidence was used at trial exacerbated the error: the prosecutor was permitted to introduce in evidence, and display before the jury, the Thompson submachine gun; and the trial judge found it necessary to caution the persons handling the weapon concerning its dangerous propensities. ("Point that thing toward the ceiling.") But, of all of the armaments appellant purchased, this was the only weapon displayed to the jury, and was the only weapon which appellant had never had in his possession.

We are constrained to conclude that it was error to receive this evidence, and that the error deprived appellant of a fair trial.

## IV. SENTENCING ISSUES

■ Section 2A6.1(a) of the Sentencing Guidelines provides for a six-level increase in the base offense level for the offense of communicating threats in interstate commerce "if the defendant engaged in any conduct evidencing an intent to carry out such threat." The sentencing judge applied the six-level increase, but did not make any express finding that the appellant had "engaged in any conduct evidencing an intent to carry out such threat." At time of sentencing, the judge stated:

"I would find in this case that based upon the nature of the case that the activities, all of the activities of Mr. Philibert are material. I think it is very significant he bought a large number of weapons and with those weapons a fair-large amount of ammunition. I think that is very significant.

Also I think his activities dealing with when he shot this horse and the fact he cut the horse's head off and really doesn't make a difference where he put the horse head whether it was on this Richard Russell Building, U.S. Courthouse, Fulton County Courthouse, or Paulding County Courthouse.

I don't think that within itself is significant. I think the significance is he did it and I think it needs to be in the presentence report because I think it shows his mental attitude. I think it is a factor you have to consider in this matter."

As we view the record, there was no evidence to suggest any connection whatever between appellant's acquisition of firearms in June and any effort to carry out the threat made against Mr. Steineke on August 11th. Indeed, a reasonable conclusion from the facts of record is that, just as he had done in 1988, appellant made the threatening phone call to Mr. Steineke "because he felt like it"; there is no evidence whatever that he had any intention of carrying out the threat. If the defendant is retried and convicted, the sentencing court should not apply the six-level increase unless there is additional evidence which justifies the required factual findings.

■ Appellant is also correct in contending that, contrary to the sentencing judge's view, a downward departure would have been permissible in this case. Section 5K2.13 of the Sentencing Guidelines provides:

"If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public."

Appellant's telephone call was a "non-violent crime." After his arrest, appellant was examined by government physicians, who concluded that he was suffering from severe mental illness, including paranoid delusions, in August of 1988. He had no significant criminal history. The sentenc-

ing judge refused to consider a downward departure under that provision, stating "I do not believe I have authority to depart downward. I think that the factors set out by the defendant have already been considered by the Sentencing Commission in formulating the Guidelines. In that respect, I do not believe I can depart downward."

We are satisfied that the sentencing court did have the authority to grant a downward departure because of appellant's mental condition. We do not decide, of course, whether appellant should have been granted a downward departure; we hold merely that he was entitled to have the sentencing court consider the issue, and exercise its discretionary authority.

## V. CONCLUSIONS

For the reasons discussed above, the judgment appealed from is VACATED, and the case REMANDED to the district court for a new trial and, if necessary, further proceedings not inconsistent with the views expressed in this opinion.