United States Court of Appeals,

Eleventh Circuit.

No. 94-2981.

UNITED STATES of America, Plaintiff-Appellee,

v.

Ronald Gene BARBOUR, Defendant-Appellant.

Dec. 12, 1995.

Appeal from the United States District Court for the Middle District of Florida. (No. 94-21-CR-ORL-22), Conway, Anne A., District Judge.

Before KRAVITCH, Circuit Judge, HILL, Senior Circuit Judge, and ALAIMO[*], Senior District Judge.

KRAVITCH, Circuit Judge:

Ronald Gene Barbour appeals his conviction and sentence for threatening the President of the United States, in violation of 18 U.S.C. § 871. He contends that the district court erred in denying his motion to suppress evidence he alleges was taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Barbour also argues that at sentencing the district court improperly used evidence of action taken prior to his threat to kill the President, in order to support a six-level enhancement on the ground that he demonstrated an intent to carry out this threat, pursuant to U.S.S.G. § 2A6.1(b)(1). We affirm defendant's conviction and sentence.

I.

On January 11, 1994, suffering from severe depression, Barbour attempted suicide at his apartment in Florida. Before his attempt,

---

[*]Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation.

he had written a suicide note.  After the attempt failed, he put his gun and clothes in his car and drove toward West Virginia, where he again intended to commit suicide.  Barbour missed his exit, however, and decided instead to drive to Washington, D.C. to assassinate President Clinton.  That same night, Barbour checked into the Mt. Vee Motel in Alexandria, Virginia, where he stayed for seven nights.

According to statements subsequently made by Barbour to Secret Service agents, Barbour went to the Mall in Washington each day of his trip, intending to shoot the President while the President was jogging.  Barbour also told the agents that he walked around the White House several times and that he transported one hundred rounds of ammunition to Washington.  It had been Barbour's intention to kill the President and to get himself killed in the process.  While in Washington, however, Barbour discovered that the President was in Russia.  On January 18, 1994, Barbour headed back to Florida, and a few days later he sold his gun.

On January 29, 1994, Barbour invited a neighbor into his apartment.  Barbour told him about his journey to Washington.  His neighbor returned with his fiancee and a tape recorder.  Barbour's brother also was present.  Barbour told these witnesses, as recorded on tape, of his desire to kill the President.  Over the next few days, Barbour related the events of his trip to several other people.  At the urging of some of his neighbors, Barbour went to the Veteran's Administration hospital (V.A.) on February 3, 1994 for psychiatric treatment.

On February 1, 1994, Secret Service agents began an

investigation based on information that someone had attempted to assassinate the President. In the course of their investigation, which eventually led them to Barbour, the agents saw Barbour's suicide note and learned that he had attempted suicide. On February 3, 1994, the agents were told that Barbour was going to the V.A. to seek treatment for a mental problem. With this information, the agents traveled to the V.A. While Secret Service Special Agents John F. McKenna and Eugene L. Sveum met with Daniel Doherty, head of the administration at the V.A. Clinic, Barbour was in the lobby awaiting treatment.

Doherty agreed to assist the agents in finding Barbour. After locating Barbour in the lobby, Doherty brought him to his office where he was immediately joined by the special agents. According to Barbour, McKenna and Sveum were identified as agents, and both "quickly flashed their badge." The agents advised Barbour that they wanted to talk to him about the information they had received that he had traveled to Washington to attempt to assassinate President Clinton. They also told him that they would help him receive mental health treatment. Agent McKenna testified that he took Barbour's personal history and in the process learned that Barbour had once been committed to the Walter Reed Army Medical Center after attempting suicide. After taking Barbour's history, McKenna read him the *Miranda* warnings. Barbour told McKenna that he understood his rights and indicated that he wished to talk to the agents. At the time, Barbour indicated that he was aware that it is a crime to attempt to kill the President. At the suppression hearing, Barbour denied that *Miranda* warnings were ever recited,

but testified that, had they been read, he would have understood them.[1]  The agents described Barbour as well-mannered, courteous and cooperative throughout the entire interview.  Barbour described the Secret Service agents as extremely polite, courteous and friendly, reminding him of "workers at Disney World."

Immediately after his interview with the agents, Barbour met with Dr. DeCastro, who found him to be suicidal and in need of immediate treatment.  Pursuant to Florida law, Fla.Stat.Ann. § 394.463, Dr. DeCastro committed Barbour involuntarily to a private mental health facility, Lakeside Alternatives.

Agent McKenna testified that on the next day, February 4, 1994, he visited Barbour at Lakeside Alternatives, presented him with a Secret Service form entitled "Consent to Search," and informed him of his constitutional right to refuse to give consent.  Barbour was cooperative and appeared to Agent McKenna to be logical in his thinking.  The consent to search form, which was read to Barbour, authorized the agents to search his apartment and car and to seize any contraband or evidence "in the nature of a threat against the president."  The form also indicated that no promises were being made in exchange for Barbour's consent.  Barbour signed the form.

Agent McKenna returned to Lakeside Alternatives on February 7, 1994.  He told Barbour that he wanted to ask him questions about his trip to Washington, D.C., and, again, he read Barbour the

---

[1]Barbour served as a military police officer.  Additionally, he received a liberal arts degree from Rollins College and took correspondence courses in criminal justice.  He testified that he had read the *Miranda* opinion for one of these courses.

*Miranda* warnings. Barbour denied that he was given the *Miranda* warnings. At this time, Barbour was taking Ativan and Lithium for his depression.[2] Once again Barbour was cooperative, coherent, and polite, and answered all questions asked.

The district court found that Barbour was read his *Miranda* warnings on February 3 and 7, 1994, and that he understood his rights. The court further found that Barbour was read the consent to search form on February 4, 1994, and that he understood his rights on that occasion as well. Finding no evidence that Barbour's severe depression interfered with his ability to think clearly or understand the charges being made against him, and that on the facts of this case the promise of mental health treatment was not coercive, the district court found that his statements were not coerced and that the government had met its burden of proving by a preponderance of the evidence that Barbour voluntarily waived his rights. *See Colorado v. Connelly,* 479 U.S. 157, 168-69, 107 S.Ct. 515, 522-23, 93 L.Ed.2d 473 (1986).

## II. Motion to Suppress

The denial of a motion to suppress presents a mixed question of law and fact. In determining whether Barbour's consent to search was voluntary, we defer to the district court's findings of fact unless clearly erroneous. *See United States v. Blackman,* 66 F.3d 1572, 1577 (11th Cir.1995). However, we review the district court's application of the law to the facts *de novo. Id.* "The district court's ultimate conclusion on the voluntariness of a

___

[2]The district court found that at the time of the February 3 and 4 meetings, Barbour was not taking the medications subsequently prescribed for his depression.

confession, or the waiver of *Miranda* rights, raises questions of law to be reviewed *de novo.*" *Id.* (citing *Beckwith v. United States,* 425 U.S. 341, 347-48, 96 S.Ct. 1612, 1616-17, 48 L.Ed.2d 1 (1976); *United States v. Parr,* 716 F.2d 796, 817-18 (11th Cir.1983)); *see Coleman v. Singletary,* 30 F.3d 1420, 1426 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995). We base our determination on the "totality of the circumstances," *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), construing the facts in the light most favorable to the party prevailing below. *United States v. Cure,* 996 F.2d 1136, 1138 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994).

Barbour alleges that he was never informed of his *Miranda* rights. He also contends that even if he were informed of these rights, he did not waive them "voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. He claims that given his severe mental depression and medicated state, Agent McKenna's promise to provide help in obtaining mental health treatment was coercive.

The threshold inquiry is whether Barbour was informed of his *Miranda* rights. *See New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984); *Miranda,* 384 U.S. at 468-70, 86 S.Ct. at 1624-26. The district court found that Barbour was read his *Miranda* warnings on February 3 and 7. Barbour himself admitted that he signed the "Consent to Search" form on February 4. Because we conclude that the district court's determination is not clearly erroneous, this threshold inquiry is satisfied. Thus, we

turn to Barbour's claim that his *Miranda* rights were not waived "voluntarily, knowingly, and intelligently."

In *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court explained the two-part inquiry into whether a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 421, 106 S.Ct. at 1141 (quoting *Fare,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197) (citations omitted).

We begin with the first prong, whether the waiver was made voluntarily. The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary; there must be coercion by an official actor. *See Colorado v. Connelly,* 479 U.S. at 169-70, 107 S.Ct. at 522-23; *Coleman v. Singletary,* 30 F.3d at 1426; *Purvis v. Dugger,* 932 F.2d 1413, 1422-23 (11th Cir.1991), *cert. denied,* 503 U.S. 940, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992). Thus, the fact that Barbour was suffering severe depression does not render his statements involuntary unless the agents took advantage of his mental illness. In this case, the agents did no more than offer to help Barbour obtain medical assistance, which he in fact received. The district court found that the agents' promise to help Barbour receive mental health treatment was not an assurance that the entire matter would not be treated as a criminal

issue.  This conclusion is supported by the testimony of Agent McKenna, Barbour's own statement that he was aware that the agents were investigating a charge that he had attempted to kill the President, and his knowledge that this attempt was a crime. Finally, Barbour described the agents as extremely polite and very courteous.  Absent any evidence of psychological or physical coercion on the part of the agents, there is no basis for declaring Barbour's statements and consent to search involuntary.

We turn now to the second prong of the waiver analysis, namely, whether the waiver was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran,* 475 U.S. at 421, 106 S.Ct. at 1141.  Barbour appears to argue that because of his mental condition and use of the drugs Lithium and Ativan, he was unaware of the consequences of abandoning his rights, that is, he did not abandon them knowingly and intelligently.  Although a defendant's impaired mental state (whether drug induced or otherwise) may prevent that person from understanding the nature of his or her waiver, *Coleman,* 30 F.3d at 1426, this is not the case here.  The district court found there was no evidence that Barbour's severe depression interfered with his ability to think clearly or with his understanding of the charges made against him.  Likewise, the court found that the Lithium and Ativan Barbour was taking on February 7 did not impair his ability to understand his rights on that day. In fact, Barbour himself testified that had he been informed of his *Miranda* rights he would have understood their meaning, and his educational and military experience support this admission.

Because the district court's findings were not clearly erroneous, we accept that Barbour was informed of his *Miranda* rights. Because we also accept Barbour's own admission that he would have understood his rights had they been read to him, we conclude that Barbour voluntarily waived his rights and that he was aware of the nature of these rights and the consequences of waiving them.

### III. Sentence Enhancement

The Sentencing Guidelines require a six-level enhancement "[i]f the offense involved any conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(1). Barbour argues that this enhancement was incorrectly applied to his sentence by the district judge.

Whether Barbour's conduct evidenced an intent to carry out his threat raises a mixed question of law and fact. Although we review the district court's factual findings under a clearly erroneous standard, *United States v. Burton,* 933 F.2d 916, 917 (11th Cir.1991), whether the facts evidence an intent to carry out the threat is a question of law and is reviewed *de novo. Id.* Whether conduct that occurred prior to a threat may be considered when determining if a defendant evidenced an intent to carry out that threat is a pure question of law subject to *de novo* review. *Id.*

Barbour contends that the conduct upon which the district court based its application of the enhancement should not have been considered because it occurred prior to his threat. Specifically, Barbour argues that evidence of his January 11-18 trip to Washington and the events that occurred there may not be used to

prove an intent to carry out a threat made on January 29 of that same year.

Barbour cites *United States v. Philibert,* 947 F.2d 1467, 1468 (11th Cir.1991), in which this court refused to uphold a six-level enhancement under § 2A6.1(b)(1). *Philibert* involved a defendant's threat to kill his supervisor. The first time the defendant made such a threat, he said he did it "because he felt like it." *Id.* at 1468. Nine months after this first threat, the defendant purchased guns, bayonets and ammunition. *Id.* Fifty-three days after purchasing these weapons, the defendant telephoned his supervisor and threatened his life. *Id.* at 1468-69. The district court based the enhancement on the fact that the defendant had purchased the weapons. This court refused to uphold the enhancement because there was no evidence in the record

> to suggest any connection whatever between appellant's acquisition of firearms ... and any effort to carry out the threat.... Indeed, a reasonable conclusion from the facts of record is that [the appellant made the second threatening call] "because he felt like it'; there is no evidence whatever that he had any intention of carrying out the threat.

*Id.* at 1471. This Court added that if the defendant were reconvicted,[3] the six-level enhancement should not be applied *unless* there were additional evidence to justify the required factual finding. *Philibert* requires that for a § 2A6.1(b)(1) enhancement to be justified, there must be an evidentiary basis to support the conclusion that the defendant's conduct evidenced an intent to carry out the threat. The decision in*Philibert* did not, however, rule out the use of pre-threat conduct in determining

---

[3]The sentence was also overturned. *Philibert,* 947 F.2d at 1472.

whether a defendant intended to carry out his or her threat. *See United States v. Hines,* 26 F.3d 1469, 1474 n. 2 (9th Cir.1994).

Barbour also refers us to *United States v. Hornick,* 942 F.2d 105 (2nd Cir.1991), *cert. denied,* 502 U.S. 1061, 112 S.Ct. 942, 117 L.Ed.2d 112 (1992), where the Second Circuit held that pre-threat conduct may not be used to support an enhancement under § 2A6.1(b)(1). We follow the Ninth Circuit in declining to follow *Hornick. See United States v. Hines,* 26 F.3d at 1474;[4] *see also United States v. Gary,* 18 F.3d 1123, 1128 (4th Cir.) (holding that pre-threat conduct may form the basis of a § 2A6.1(b)(1) enhancement), *cert. denied,* --- U.S. ----, 115 S.Ct. 134, 130 L.Ed.2d 77 (1994). The guideline recognizes that "the seriousness of [the threat] depends upon the defendant's intent and the likelihood that the defendant would carry out the threat." § 2A6.1, comment. (backg'd.); *see also Hines,* 26 F.3d at 1474. If the defendant's acts demonstrate both that he or she intends to act on the threat and is, in fact, likely to do so, then whether those acts occurred before or after the threat should make no difference. It would make no sense to punish more severely the person who threatens to kill the President while driving to the store to purchase a gun than the person who makes the same threat on the way home from the same store. *See United States v. Harris,* 763 F.Supp. 546, 551 n. 11 (M.D.Ala.1991).

---

[4]The facts of *Hines* are strikingly similar to those of the present case. Hines had gone to Washington, armed with a gun, in order to kill President Bush. He went to where he thought the President was making an appearance, but the President was 45 miles away. He then left Washington. Over the course of the next month, Hines told several people that he intended to kill President Bush. 26 F.3d at 1472.

Despite our disagreement with the Second Circuit's categorical rule in *Hornick,* however, we are sensitive to the concern expressed by that court when it wrote:

> If prior to the actual making of a threat, the government might scour a defendant's past to unearth some incident that might point to an intent on defendant's part to carry out a threat he made later, an upward adjustment would become almost automatic, and would bear only a tenuous relationship to the primary conduct at issue—the threat itself.

*Hornick,* 942 F.2d at 108. The fact that a person has at some point in life engaged in dangerous or even illegal activity is insufficient to demonstrate that that person intended to carry out any particular threat. The purpose of the enhancement is to punish more severely the individual whose actions indicate an intent to carry out the threat that serves as the basis for the underlying conviction. It is not a general mandate to punish more severely people with bad character or those generally more likely to carry out their threats. This is the reason why the enhancement in *Philibert* was reversed. Although there may be every reason to think that a person who purchases weaponry is more likely to carry out death threats than one who does not, the district court in *Philibert* did not make the necessary further findings to support the claim that there was a close nexus between the defendant's acts and his threat.

Because the evidence must support a direct connection between the defendant's acts and his or her threat, pre-threat conduct often may be less persuasive than post-threat conduct. Nonetheless, we hold that under certain circumstances pre-threat conduct may be used as evidence to demonstrate a defendant's intent to carry out a threat. Factors a district court should consider in

determining the probative value of pre-threat conduct include the following:  the proximity in time between the threat and the prior conduct, the seriousness of defendant's prior conduct, and the extent to which the pre-threat conduct has progressed towards carrying out the threat.

In the present case, Barbour "was not just making idle threats."  *Hines,* 26 F.3d at 1474.  Less than two weeks prior to his threats, Barbour was in Washington, D.C., with one hundred rounds of ammunition, waiting to assassinate the President.  He failed to carry out his plan only because the President never arrived where Barbour was waiting, and he returned home only after discovering the President was out of the country.  Barbour never deviated from his plan to kill the President;  he was just denied the opportunity.  Thus, when Barbour made his threats after returning home, there was every reason to conclude that he intended to act on those threats and that he was likely to do so.  Because the record supports the district court's determination that Barbour had evidenced an intent to carry out his threat, the six-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(1) was properly applied.

IV.

For the foregoing reasons, Barbour's conviction and sentence are AFFIRMED.