[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 14, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16595
Non-Argument Calendar

_____

D. C. Docket No. 04-00302-CR-WBH-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VIRGIL BROWN,
a.k.a. Virgil A. Brown,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(September 14, 2007)**

Before HULL, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Virgil Brown appeals his conviction for conspiracy to manufacture, deal in,

possess, and conceal counterfeit currency, in violation of 18 U.S.C. § 471; dealing in counterfeit currency, in violation of 18 U.S.C. § 473; manufacturing counterfeit currency, in violation of 18 U.S.C. § 471; possessing and concealing counterfeit currency, in violation of 18 U.S.C. § 472; possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), and 851. On appeal, Brown challenges the district court's denial of his motion to suppress his confession and certain evidence seized in the search of his residence. After review, we affirm.

## I. BACKGROUND

### A. Arrest

Using a confidential informant, Secret Service agents arranged to purchase counterfeit currency from Brown and his co-defendant, Steven Earl Thompson, in a mall parking lot. Agents arrested Brown and Thompson. Brown was taken to the mall's security office in handcuffs, where he was asked some general questions, but was not interrogated. At one point, Brown asked for a copy of the federal sentencing guidelines. In response, Special Agent Scott Donovan used profanity toward Brown and spoke in a loud, threatening tone.

Brown had brought his baby with him to the mall. While Brown was held in the mall security office, Special Agent Tammy McCravy took care of Brown's

baby. Agent McCravy asked Brown for the contact information for Mrs. Brown, the baby's mother, but Brown refused to provide it. Agent McCravy explained to Brown that, if she could not reach Mrs. Brown to arrange to give her the baby, Agent McCravy would have to call the Department of Family and Children Services ("DFACS"), Georgia's child protective services agency. Brown wanted Agent McCravy to give the baby to Brown's mother, but Agent McCravy explained that she would release the baby only to the legal guardian. Brown finally gave Agent McCravy Mrs. Brown's telephone number. Agent McCravy called Mrs. Brown and told her that agents were taking the baby to her residence and that she needed to meet them at the house to take custody of the baby.

## B.    Waiver of <u>Miranda</u>[1] Rights and Confession

While Agent McCravy transported the baby to the Browns' residence, Special Agent Scott Gignilliat escorted Brown to the Secret Service office. On the way, Agent Gignilliat told Brown that he had read Brown's lips during the surveillance and had seen Brown indicate that law enforcement was present. Agent Gignilliat asked Brown why he went through with the deal. Brown responded that he had seen agents following him throughout the day and that he wished he had backed out of the deal. Agent Gignilliat told Brown that agents were attempting to

---

[1] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966).

get a search warrant for Brown's residence and asked Brown if there were any firearms in his house. Brown assured Agent Gignilliat that there were no firearms.

When Agent Gignilliat and Brown arrived at the Secret Service office approximately 30 to 45 minutes later, another agent informed Agent Gignilliat that Brown had not yet been mirandized. Up to this time, Agent Gignilliat believed that another agent gave Brown his <u>Miranda</u> warnings at the mall. Agent Gignilliat asked Brown if he had been read his <u>Miranda</u> rights, and Brown responded that he had not. Agent Gignilliat then informed Brown that nothing Brown had said up to that point could be used against him in court, but that his actions could be used against him and could be used to help agents get a search warrant.

Agent Gignilliat encouraged Brown to cooperate and read Brown his <u>Miranda</u> rights. Agent Gignilliat also let Brown read the <u>Miranda</u> waiver form several times. Brown debated to himself and discussed with the agents whether he wanted to waive his <u>Miranda</u> rights. Ultimately, Brown signed the waiver of his <u>Miranda</u> rights.

During this discussion at the Secret Service office, Agent Gignilliat's tone of voice was non-threatening. No one raised their voice at Brown or threatened him. Brown appeared to be in good physical condition and coherent. Brown did not show signs of alcohol or drug use, understood what Agent Gignilliat said to him,

and gave appropriate responses.

## C.     Consent to Search

After signing the Miranda waiver, Brown informed Agent Gignilliat that 100 pounds of marijuana were in his house. Brown also admitted that he had bought fifty $5 bills and was bleaching them to make counterfeit money.

Brown was primarily concerned that all the blame for the contraband in the house should be laid at his feet and that his family should not be implicated. Agent Gignilliat spoke with Agent McCravy, who indicated that Mrs. Brown was not a target of the investigation. Agent Gignilliat conveyed this information to Brown.

Brown asked to speak with his wife. Agent Gignilliat gave Brown a cellular phone and allowed him to call Mrs. Brown. Mrs. Brown indicated to her husband that she was not going to be detained. After this telephone call, Brown signed a consent to search his house. Agent Gignilliat told Brown he could refuse to sign the consent form.

Meanwhile, Agent McCravy and several other agents arrived at the Browns' residence with the baby. Brown's sister and mother arrived at the home and asked for the baby. Agents refused, indicating that they would give the baby only to Mrs. Brown.

Because it was raining, Agent McCravy kept the baby in her vehicle while

5

they waited for Mrs. Brown. Once Mrs. Brown arrived, Agent McCravy and Mrs. Brown walked to Agent McCravy's vehicle so Mrs. Brown could get the baby. As they walked, they discussed whether Mrs. Brown would consent to a search of her house. Then, Agent McCravy was advised that Brown wanted to speak to his wife on the telephone. Agent McCravy handed the telephone to Mrs. Brown.

Following the call, Mrs. Brown said she would sign the consent to search form. When Mrs. Brown signed the form, the baby was still in the back of Agent McCravy's car. However, signing the consent form was not a condition of releasing the baby to Mrs. Brown. Mrs. Brown appeared to have no problems understanding the agents and did not appear to be under the influence of drugs or alcohol. Agents did not get to the point of telling Mrs. Brown that she could refuse to consent because, as soon as she finished her telephone conversation with Brown, Mrs. Brown said she would sign the consent form.

After signing the consent to search form, Mrs. Brown took possession of the baby and opened the door to the house for the agents. Mrs. Brown then left with her mother-in-law and sister-in-law. At the residence, agents found materials for manufacturing counterfeit currency, marijuana plants and two marijuana grow rooms.

**D. Motion to Suppress**

6

Prior to trial, Brown moved to suppress his confession and the evidence seized during the search of his house. Brown argued that his <u>Miranda</u> waiver and consent to search were coerced. The magistrate judge's report and recommendation ("R&R") recommended that the motion to suppress be denied. The magistrate judge found that Brown's wife voluntarily consented to the search of the house, noting, <u>inter alia</u>, that: (1) Mrs. Brown was never detained; (2) no violence or threats of violence were used against her; (3) she appeared mentally capable of granting consent; (4) she was given an opportunity to speak with Brown before giving consent; (5) her consent to search was never conditioned upon her regaining possession of her baby; and (6) the consent to search was given in the presence of family members.

The magistrate judge also found that Brown's consent to search was voluntary, noting that: (1) no one threatened or touched Brown; (2) Brown was mentally capable of providing consent; (3) Brown had prior experience with the criminal justice system and even asked for a copy of the federal sentencing guidelines; (4) the agents permitted Brown to speak with his wife upon his request, and a phone call occurred while his wife was taking custody of the baby; and (5) Brown was advised of his right to refuse consent. The magistrate judge also concluded that, even absent the consent of Brown and his wife, the Secret Service

7

would have inevitably discovered the items in the search given that there was probable cause to obtain a search warrant based on the agents' observations of Brown's conduct during the transactions at the mall.

Finally, the magistrate judge found that Brown voluntarily waived his Miranda rights, noting: (1) Brown was neither intoxicated nor mentally impaired; (2) Brown was not handcuffed, and weapons had not been drawn; and (3) Brown was informed of the consequences of waiving his rights. The magistrate judge also concluded that Brown was not coerced into his Miranda waiver by the agents informing him that his baby would be given to DFACS if they were unable to contact his wife. The magistrate judge also concluded that Agent Gignilliat did not act in bad faith when he elicited potentially incriminating pre-Miranda warning statements from Brown.

The district court, over Brown's objections, adopted the R&R and denied Brown's motion to suppress. Following a jury trial, Brown was convicted on all counts. Brown filed this appeal.

## II. DISCUSSION

### A. Waiver of Miranda Rights

On appeal, Brown argues that the district court erred in denying his motion to suppress his confession. Brown contends that his confession was coerced

8

because: (1) Agent McCravy threatened to turn Brown's baby over to DFACS, (2) Agent Donovan yelled and cursed at Brown to urge him to cooperate, and (3) Agent Gignilliat questioned Brown and obtained his confession before giving Miranda warnings.

An accused effectively waives his Miranda rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) made his decision with the full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the "totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension." Id.[2]

Here, the government presented evidence that Brown carefully read the waiver form before signing it, debated with himself and discussed with agents whether to waive his Miranda rights, and was told that nothing he had said prior to the Miranda warnings could be used against him. There is no evidence in the record that agents told Brown his baby would be turned over to DFACS if he did

---

[2]A ruling on a motion to suppress presents a mixed question of law and fact. As such, we review the district court's factual findings for clear error and its application of the law to the facts de novo. United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). We construe all facts in favor of the prevailing party below. Id.

9

not sign the waiver form. Agent McCravy testified that she merely explained to Brown that she would have to call DFACS to take the baby if Brown did not provide a telephone number for the baby's mother. Brown himself did not testify at the suppression hearing and no one contradicted the agents' testimony. Furthermore, although Agent Donovan initially yelled at Brown while he was held in the mall security office, Brown's decision to sign the waiver form was made more than thirty minutes later, at the Secret Service office, during a nonthreatening conversation with Agent Gignilliat.

Finally, the existence of a statement made prior to receiving Miranda warnings generally does not require suppression of a knowing and voluntary statement made after the Miranda warnings have been given. Oregon v. Elstad, 470 U.S. 298, 309, 105 S. Ct. 1285, 1293 (1985); United States v. Street, 472 F.3d 1298, 1312 (11th Cir.), cert. denied, 127 S. Ct. 2988 (2007). We reject Brown's contention that he falls within the exception to this general rule first recognized in Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004). No evidence was presented to suggest that Brown's first statement was the result of a deliberate "question first" strategy by any agents. Indeed, the evidence indicated that Agent Gignilliat mistakenly believed Brown had already been given his Miranda warnings and that as soon as Agent Gignilliat learned the truth, Agent Gignilliat

10

promptly explained to Brown that his previous statements to the agents could not be used against him and gave Brown the full <u>Miranda</u> warnings. <u>See</u> <u>Street</u>, 472 F.3d at 1314 (concluding that second warned confession was admissible where agent "messed up" and failed to give <u>Miranda</u> warnings before first confession).

Given the totality of the circumstances, we cannot say the district court clearly erred in finding that Brown knowingly and voluntarily waived his <u>Miranda</u> rights. Accordingly, the district court did not err in denying Brown's motion to suppress his confession.

**B.      Consent to Search**

We also conclude that the district court did not err in denying Brown's motion to suppress the evidence found during the search of his residence.

Voluntary consent is a well-established exception to the Fourth Amendment's probable cause and warrant requirements. <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989). In determining whether a defendant's consent to a search was voluntary, the district court examines the totality of the circumstances, looking at "several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incrimination evidence will be

11

found." United States v. Simms, 385 F.3d 1347, 1355 (11th Cir. 2004).[3]

Here the evidence indicates that Agent Gignilliat asked Brown for his consent in a non-threatening manner and advised Brown that he had the right to refuse to consent. Again, although Agent Donovan had yelled at him at the mall security office, that incident occurred over thirty minutes earlier in another location, and there is no evidence that Agent Donovan was present when Agent Gignilliat asked for Brown's consent. There was also no evidence that the return of Brown's baby to Mrs. Brown was conditioned on Brown agreeing to the search. Furthermore, agents permitted Brown to speak with his wife as she arrived at the residence to take custody of their baby, which he did before giving his consent.

Under the totality of the circumstances, we find no clear error in the district court's finding that Brown voluntarily consented to the search of his residence.[4]

**AFFIRMED.**

---

[3]We review the district court's factual finding that consent was voluntary for clear error. United States v. Zapata, 180 F.3d 1237, 1240-41 (11th Cir. 1999).

[4]Because we affirm the district court's finding that Brown voluntarily consented to the search, we do not address the voluntariness of Mrs. Brown's third-party consent or the district court's alternative application of the inevitable discovery doctrine.